732 A.2d 493 (1999)
159 N.J. 484
METLIFE CAPITAL FINANCIAL CORPORATION, Plaintiff-Appellant,
v.
WASHINGTON AVENUE ASSOCIATES L.P. and Lawrence S. Berger, Defendants-Respondents,
and
United States of America, Defendant.
Supreme Court of New Jersey.
Argued March 16, 1999.
Decided June 30, 1999.
*494 Laurence B. Orloff, Mendham, for plaintiff-appellant (Orloff, Lowenbach, Stifelman & Siegel and Herrick, Feinstein *495 attorneys; Mr. Orloff, Samuel Feldman, Roseland, Stephen M. Rathkopf and Scott T. Tross, New York City, on the briefs).
Lawrence S. Berger for defendants-respondents (Berger & Bornstein, attorneys; Paul H. Schafhauser, Morristown, on the brief).
Jonathan D. Forstot, New York City, submitted a brief on behalf of amici curiae Mortgage Bankers Association of America and Commercial Real Estate Secondary Market and Securitization Association (Thacher Proffitt & Wood, attorneys; Mr. Forstot and Jonathan Rogin, of counsel and on the brief).
Clark E. Alpert, West Orange, submitted a brief on behalf of amici curiae Mortgage Bankers Association of New Jersey and League of Mortgage Lenders (Alpert & Levy, attorneys; Mr. Alpert and E. Robert Levy, of counsel; Mr. Alpert, David N. Butler and Lawrence C. Weiner, on the brief).
Michael M. Horn, Newark, submitted a brief on behalf of amici curiae The New Jersey League Community & Savings Bankers, The New Jersey Bankers Association, The Prudential Insurance Company of America, First Union National Bank, John Hancock Mutual Life Insurance Company, Massachusetts Mutual Life Insurance Company, State Farm Life Insurance Company, State Farm Mutual Automobile Insurance Company, All American Life Insurance Company, American General Life Insurance Company, American General Life and Accident Insurance Company, The Franklin Life Insurance Company, The Old Line Life Insurance Company of America, The United States Life Insurance Company in the City of New York and The Variable Annuity Life Insurance Company (McCarter & English and Jamieson, Moore, Peskin & Spicer, attorneys for New Jersey Bankers Association, attorneys; Mr. Horn, Lois M. Van Deusen and Dennis R. Casale, Princeton, of counsel; Steven A. Beckelman, Clement J. Farley, Newark, and James M. Sullivan, on the brief).
Lisa J. Rodriguez submitted a brief on behalf of amici curiae National Association of Consumer Advocates, AARP, Public Citizen, Inc., National Consumer Law Center, Consumer Federation of America, Consumer Action and The Consumers League of New Jersey (Trujillo, Rodriquez & Richards, attorneys).
Gregory G. Diebold, Jersey City, submitted a brief on behalf of amici curiae Legal Services of New Jersey and Hudson County Legal Services Corp. (Melville D. Miller, Jr., President, Legal Services of New Jersey and Timothy K. Madden, Director, Hudson County Legal Services, attorneys; Mr. Diebold, Lawrence Sindoni, Mr. Miller and Joseph Harris David, on the brief).
The opinion of the Court was delivered by GARIBALDI, J.
This appeal involves a $1.5 million dollar loan made by MetLife Capital Corporation, predecessor in interest to plaintiff MetLife Capital Financial Corporation ("MetLife"), to defendant Washington Avenue Associates, L.P. ("Washington Avenue") The loan was secured by a Mortgage and Security Agreement on a commercial property in Belleville, New Jersey. Numerous payments on the loan were delinquent, and Washington Avenue ultimately defaulted on the final "balloon payment." We now consider whether the five percent late charge assessed against each delinquent payment, and the default rate of interest, constitute reasonable stipulated damages provisions.

I.
Washington Avenue executed a four-year promissory note as evidence of its debt to MetLife. The note required Washington Avenue to make forty-eight equal monthly payments of $14,030.98, and a final "balloon payment" of $1,391,236.90, due at the end of the four-year term. The *496 promissory note provided that "a late fee equal to the lesser of five percent (5%) of the delinquent payment or the highest late charge permitted by law shall be payable with respect to any payment which is not paid within ten (10) days of the date on which it was due."
In the event of a declaration of default, the note provided that the interest rate on the unpaid principal balance would not be the non-default interest rate of 9.55 percent, but rather a default rate. The default rate was defined as "the greater of five percent (5%) per annum in excess of the `prime rate' as designated by Chase Manhattan Bank, N.A., from time to time, or fifteen percent (15%) per annum; provided, however, that such Default Rate shall not exceed the maximum rate allowable under law." On default, Washington Avenue also agreed to pay collection costs, including but not limited to MetLife's reasonable attorneys' fees, and to allow MetLife to possess the property, collect unpaid rents, and "apply the same, less costs and expenses of the operation of the Property... to the payment of any of the Secured Obligations, in such order as Grantee may determine."
When the loan was made, the mortgaged premises were leased by Washington Avenue to Walgreen Eastern Co., Inc. under a thirty-year lease. At all times during the life of the loan, the rent under the Walgreen lease was greater than Washington Avenue's monthly mortgage payments to MetLife.
Although Washington Avenue eventually made all forty-eight payments, forty payments were delinquent. The record does not indicate precisely how late Washington Avenue was with each of the payments. Washington Avenue also failed to make the balloon payment at maturity. MetLife declared the loan in default and began to collect the rent directly from the tenant.
MetLife commenced a foreclosure action against Washington Avenue, and its general partner Laurence S. Berger.[1] Washington Avenue filed an answer, challenging, among other things, the five percent late fee and the fifteen percent default rate. MetLife moved for summary judgment, and sought to strike Washington Avenue's counterclaims as non-germane. See R. 4:64-5. The court granted MetLife's motion, and concluded that the only germane counterclaims were the challenges to the late fees and default rate of interest. Thus, the court ordered the foreclosure to proceed as an uncontested action under R. 4:64-1 subject to an evidential hearing to determine the validity of the late fees and default rate of interest.
The hearing was held in February 1997. At the outset, the court, relying on Utica Mut. Ins. Co. v. DiDonato, 187 N.J.Super. 30, 453 A.2d 559 (App.Div.1982), held that MetLife bore the burden of proving the enforceability of the stipulated damages clauses. Barbara Geer, Portfolio Management Specialist for MetLife, testified at the hearing. Geer testified that a five percent late fee was the industry custom and standard, and represented an estimate of the internal costs of administering late payments. She testified that MetLife has a department that handles delinquent payments. Employees in that department attempt to collect late payments by writing letters and making telephone calls. In addition to those duties, there are reporting and monitoring functions that must be fulfilled with respect to senior management and to other bank departments, among them the accounting, real estate, and legal departments. She claimed that internal cost calculations had been performed for other loans, but had not "been able to be totally conclusive." Geer also testified that the default interest rate was intended to compensate MetLife for losses resulting from increased administrative costs, lost investment opportunities, the need for appraisals and environmental studies, litigation costs and attorneys' fees. Geer was unable to quantify any of those *497 losses, and noted that internal costs are difficult to establish conclusively.
Washington Avenue produced rebuttal testimony from Edward G. Morran, an experienced bank loan officer. Morran testified that in the event of a late payment a loan officer typically made a short phone call to the borrower and waited for payment. In his experience, the loan officer was the only person involved in collection efforts until the payment was several months overdue. Thus, the costs of administering a late payment were minimal. He also testified that the administrative costs of administering a loan did not vary with the principal amount. However, Morran did testify that the financial institution where he worked generally charged default rates of interest in the four to six percent range on all of its loans.
The court concluded that the five percent late fee represented reasonable liquidated damages. The court considered the default rate a penalty; however, it concluded that a default rate of 12.55 percent, three percent above the contract rate of 9.55 percent, was reasonably related to actual damages.
The court referred the case to the Foreclosure Unit of the Superior Court Clerk's Office for entry of final judgment. MetLife filed the required proof of the amount due as of March 31, 1997. See R. 4:64-2. That proof asserted that, in addition to the principal balance due, the late fees and default rate, the judgment should include 12.55 percent interest on property taxes paid by MetLife after default, but before final judgment. MetLife also accorded Washington Avenue a credit of $188,615.50 for rent collected directly from the tenant. MetLife sought a judgment of $1,453,183.91, inclusive of all charges and credits, Washington Avenue wrote to object to the rent credit calculation; however, its objection was not received until after the Foreclosure Unit had entered a final judgment of foreclosure based on MetLife's filed certification of proof.
Washington Avenue filed a motion for reconsideration, for relief from the foreclosure judgment, and to vacate or modify the credits for rents collected by MetLife. The court denied that motion. To preserve its rights and avoid a sheriff's sale of the property, Washington Avenue paid MetLife the full amount of the obligation in accordance with the judgment of foreclosure and repossessed the property.
Washington Avenue filed a notice of appeal, challenging the late fees and the default interest rate, and claiming additional credit for the rents collected by MetLife. MetLife did not cross-appeal the court's decision to lower the default interest rate to 12.55 percent. The Appellate Division reversed the trial court and concluded that both the five percent late fee and the default interest rate of 12.55 percent constituted unenforceable penalties. Metlife v. Washington Ave. Assoc., 313 N.J.Super. 525, 545, 713 A.2d 527 (1998). The court noted that the trial court improperly placed the burden of proving reasonableness on MetLife, but because MetLife did not appeal that ruling and because "the factual proofs were largely undisputed," the court considered the misplacement of the burden of proof "inconsequential." Id. at 538, 713 A.2d 527.
The court assessed the enforceability of the five percent late fee under the two-pronged test promulgated in Westmount Country Club v. Kameny, 82 N.J.Super. 200, 206, 197 A.2d 379 (App.Div.1964). First, the court considered if the late charge was reasonably related to the anticipated or actual damages to be suffered by the lender from the delay in payment. Ibid. Second, the court considered if those damages were difficult to establish. Ibid. The court held that the first requirement was not satisfied, because the five percent late charge was unrelated to the duration of the breach or amount of the installment. Id. at 540-41, 713 A.2d 527. The court concluded that MetLife's collection costs would be the same regardless of the size of the payment or duration of the breach. *498 Ibid. The court also held that the second requirement was not satisfied, because collection costs and the value of the loss of use of the late payment could easily be calculated. Id. at 541-42, 713 A.2d 527. The court rejected the default interest rate for the same reasons, and held that the trial court's adjustment to 12.55 percent was entirely speculative. Id. at 544-45, 713 A.2d 527. Finally, the court held that MetLife's failure to credit the rents to Washington Avenue's outstanding obligations as collected, or credit Washington Avenue with interest on the total sum collected, violated the implied covenant of good faith and fair dealing that inheres in every contract. Id. at 534, 713 A.2d 527.
Accordingly, the court vacated the judgment of foreclosure allowing the five percent late fees and the 12.55 percent default rate and remanded the matter to permit MetLife to present proof of the actual damages sustained by reason of the late payments and the default. Id. at 545, 713 A.2d 527. The Appellate Division also remanded the case for a recalculation of the rent-credit.
We granted MetLife's petition for certification. 156 N.J. 427, 719 A.2d 1025 (1998).

II.
Historically, courts have closely scrutinized contract provisions that provided for the payment of specific damages upon breach. Wasserman's Inc. v. Middletown, 137 N.J. 238, 248, 645 A.2d 100 (1994). The need for close scrutiny arises from the possibility that stipulated damages clauses may constitute an oppressive penalty. Enforceable stipulated damages clauses are referred to as "liquidated damages," while unenforceable provisions are labeled "penalties." Ibid. (quoting Kenneth W. Clarkson, et al., Liquidated Damages v. Penalties: Sense or Nonsense'?, 1978 Wise. L.Rev. 351, 351 n. 1).
The common law distinction between a provision authorizing liquidated damages and a provision authorizing a penalty was set forth in the Restatement of Contracts more than 60 years ago:
An agreement, made in advance of breach, fixing the damages therefore, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

[Restatement of Contracts § 339 (1932).]
New Jersey adopted the Restatement method for evaluating stipulated damage clauses in Westmount Country Club v. Kameny, 82 N.J.Super. 200, 197 A.2d 379 (App.Div.1964). In Westmount, the Appellate Division considered the validity of a contract clause requiring full payment for a country club membership, even if the membership was canceled mid-year. Westmount, supra, 82 N.J.Super. at 203, 197 A.2d 379. That court concluded that there was no evidence that the full contract price was a reasonable estimate of damages or that the actual damages were difficult to estimate and declined to enforce the stipulated damages clause. Id. at 206-07, 197 A.2d 379.
The law, however, has not remained static. Courts began to treat the two-pronged Westmount test as a continuum; the more uncertain the damages caused by a breach, the more latitude courts gave the parties on their estimate of damages. Charles J. Goetz & Robert E. Scott, Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach, 77 Colum. L.Rev. 554, 560 (1977). The Uniform Commercial Code provision on liquidated damages, adopted in New Jersey as N.J.S.A. 12A:2-718, incorporated this more flexible test. *499 N.J.S.A. 12A:2-718 treats the prongs of the Westmount test as elements of "reasonableness" in evaluating a stipulated damages provision. Id. at 560 n. 25; see also N.J.S.A. 12A:2-718(1) ("[d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."). The Second Restatement "redrafted" the liquidated damages provision "to harmonize with Uniform Commercial Code § 2-718(1)." Restatement (Second) of Contracts § 356 (Reporter's Note) (1981). That provision endorsed the "reasonableness" approach employed by the Uniform Commercial Code:
Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

[Id. at § 356.]
The Appellate Division tacitly acknowledged this more flexible approach in Stuchin v. Kasirer, 237 N.J.Super. 604, 568 A.2d 907 (App.Div.1990), certif. denied, 121 N.J. 660, 583 A.2d 346 (1990). In Stuchin, the defendants in a foreclosure case challenged the application of an enhanced default rate, which increased the contract interest rate by fifteen percent. Id. at 610, 568 A.2d 907. Despite reciting the strict two-pronged test of Westmount, the Appellate Division remanded the issue to the trial court to receive "appropriate evidence of the reasonableness or unreasonableness of the 15% rate increase...." Id. at 614, 568 A.2d 907.
Subsequently, this Court expressly addressed the proper method for evaluating stipulated damages clauses. Wasserman's Inc. v. Middletown, supra, 137 N.J. at 249-54, 645 A.2d 100. In that case we considered the validity of a stipulated damages clause that provided that if Middletown canceled a lease of commercial property Middletown would pay damages equal to twenty-five percent of Wasserman's gross annual receipts. Id. at 242, 645 A.2d 100. After reviewing the history and development of stipulated damages provisions, we concluded that "[s]o viewed, `reasonableness' emerges as the standard for deciding the validity of stipulated damages clauses." Id. at 249, 645 A.2d 100. Treating reasonableness "as the touchstone," we noted that the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the validity of a stipulated damages clause. Id. at 250-54, 645 A.2d 100. We did not, however, consider any of those factors dispositive, and remanded the case, leaving "to the sound discretion of the trial court the extent to which additional proof is necessary on the reasonableness of the clause." Id. at 258, 645 A.2d 100.

III.

A.
Applying the principle that "[t]he overall single test of validity is whether the [stipulated damage] clause is reasonable under the totality of the circumstances," we address the validity of the five percent late fee included in this contract. Wassenaar v. Panos, 111 Wis.2d 518, 331 N.W.2d 357, 361 (1983). We find that under that "reasonableness" test, the five percent late fee is a valid measure of liquidated damages.
We first observe that liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness. Wasserman's, supra, 137 N.J. at 252-53, 645 A.2d *500 100. The Appellate Division found that the trial court had improperly placed the burden of proof on MetLife, but concluded that this error was "inconsequential." Metlife, supra, 313 N.J.Super. at 538, 713 A.2d 527. We disagree. The Appellate Division, despite noting that requirement, "inferred" that the five percent late fee had a coercive purpose. Id. at 543, 713 A.2d 527 ("Geer did not testify that one of the purposes of the late charge was coercive, that is, to provide an incentive to the borrower, on pain of incurring the late charge, to make timely payments. But we are convinced that such a purpose may be inferred.") In light of the presumptive reasonableness of the clause, the appellate court's inference was unwarranted and cannot be considered inconsequential.
The Appellate Division found that the five percent late fee was a penalty because it was not "reasonably related to the anticipated or actual internal costs suffered by the lender due to the delay in payment." Ibid. The panel incorrectly concluded that the damages resulting from a late payment would not vary with the amount due. It seems evident that late payments on larger loans would present a greater risk to the lender, and would require more intense and expensive supervision. As one commentator observed:
It should have occurred to the court that larger loans constitute a more significant portion of a lender's portfolio and therefore may command more attention than do smaller loans. Assuming that proposition is correct, it follows that a delinquent payment on a $10 million loan may engender more concern and costs than a delinquent payment on a $100,000 loan.
[Laurence M. Smith, MetLife CapitalThe Uncertain Fate of Default Rate and Late Fee Provisions, 29 Seton Hall L.Rev. 970, 974 (1998).]
Furthermore, it is undisputed that the damages resulting from the loss of investment opportunity increases-with the size of the late installment payment. Thus, a lender suffers both larger administrative and "opportunity cost" damages when a borrower is late with a larger payment.
The Appellate Division's requirement that a lender demonstrate that its late fee is related to actual damages suggests that the lender must establish the cost with respect to each late payment for which a late charge is sought. Id. at 543, 713 A.2d 527. To require that operational costs be ascribed to each individual loan underestimates the difficulties and impracticalities involved in determining the actual damages incurred in dealing with delinquent borrowers. Because the costs are spread over an entire loan portfolio, it is difficult to identify specific damages attributable to the late payment or default of one specific borrower like Washington Avenue. Due to the difficulty in assessing damages attributable to a specific late payment, courts have determined that one method to assess the reasonableness of late charges is to look at what is permitted by statute and what constitutes common practice in a competitive industry.

B.
A number of factors demonstrate the "reasonableness" of this specfic five percent late fee. Barbara Geer, one of MetLife's portfolio Management Specialists, testified about MetLife's procedures in dealing with delinquent payments. Supra, at 490, 732 A.2d at 496. That testimony was uncontradicted. She also testified that a five percent late fee was normal industry custom in similar commercial mortgages.
Similarly, the Legislature has endorsed late fees that constitute a percentage of the defaulted payment in other contexts. See, e.g., N.J.S.A. 17:11C-28(c) (authorizing secondary mortgage lenders to collect late fee no greater than five percent of payment in default); N.J.S.A. 17:12-48(13) (authorizing savings and loan associations to charge late fees of five percent on any overdue payment); N.J.S.A. 17:16C-71 *501 (authorizing certain home repair contracts to impose five percent late fee on any payment in default for 10 days or more). Federal regulations contain similar provisions. See, e.g., 12 C.F.R. § 226 App. H-13, H-15 (including five percent late charge as part of model mortgage forms); 13 C.F.R. §§ 120.221, 120.971 (authorizing Small Business Association lenders to charge five percent late fee); 38 C.F.R. 36.4212, 36.4311 (authorizing Department of Veteran's Affairs guaranteed loans to included four percent late fee for delinquent installments); 24 C.F.R. § 235.1216 (authorizing Department of Housing and Urban Development guaranteed loans to include four percent late charge). Those statutes demonstrate not only that both the New Jersey Legislature and the federal government have endorsed late fees based on a percentage of the delinquent installment, but also suggest that five percent is not an unusually or unreasonably large late fee in commercial transactions.
No reported case in New Jersey has directly addressed the validity of a fixed percentage late charge. In Crest Sav. & L. Ass'n v. Mason, 243 N.J.Super. 646, 648-49, 581 A.2d 120 (Ch.Div.1990), the Appellate Division observed that a late charge could be collected as compensation for administrative expenses and the cost of funds wrongfully withheld. The court, however, did not decide whether a fixed percentage late fee was enforceable because the parties did not raise the issue. Id. at 649, 581 A.2d 120.
Cases in other jurisdictions have enforced some fixed percentage late fees and disallowed others. Cases upholding the late charges generally involve small percentages negotiated between sophisticated commercial parties, charges that represent an industry standard, or fall within a range authorized by statute. See, e.g., Mack Fin. Corp. v. Ireson, 789 F.2d 1083 (4th Cir.1986)(upholding five percent late charge based on state statute authorizing late charge no greater than five percent); In re Consolidated Properties L.P., 152 B.R. 452, 458 (Bankr.D.Md.1993)(upholding five percent late fee); In re Union Square Dev. Co., 140 B.R. 544 (Bankr.D.Colo.1992)(upholding four percent late fee). In Mattvidi Assoc. L.P. v. NationsBank, 100 Md.App. 71, 639 A.2d 228 (1994), cert. denied, 336 Md. 277, 647 A.2d 1216 (1994), for example, a Maryland court upheld a five percent late charge that took effect if a payment was delinquent for more than ten days. The court concluded that the "modern view" favored enforcement of fixed percentage penalties in "commercial transactions." Id., 100 Md. App. 71, 639 A.2d at 238. Similarly, in Travelers Ins. Co. v. Corporex Properties, Inc., 798 F.Supp. 423, 428 (E.D.Ky.1992), the court concluded that a four percent late fee was "not unreasonable in commercial transactions."
In both Travelers and Mattvidi, the courts expressly relied on the presumptive reasonableness of the late fee. The Travelers court noted that "Corporex has not cited any Kentucky decision where late fees were disallowed as a `penalty.'" Ibid. Similarly, the Mattvidi court observed, "[a]ppellants, who the circuit court found to be sophisticated, experienced real estate developers, have never even argued that the late charge was obtained by coercion or duress." Mattvidi, supra, 639 A.2d at 239. That court noted that "[i]f appellants truly believed that this provision was not reasonable, they could have negotiated different terms, as they did with regard to other portions of the loan documents." Ibid. In other words, a small percentage late fee is simply a part of the cost of acquiring a substantial commercial loan, and must be proved unreasonable.
Conversely, the cases relied on by the Appellate Division to invalidate the fixed percentage late fee involved unusually large percentages or explicit evidence of a coercive intent. See, e.g., Garcia v. Canan, 851 F.Supp. 327, 328 (N.D.Ill.1994) (imposing ten percent late fee); Garrett v. Coast & Southern Fed. Sav. & L. Ass'n, 9 Cal. 3d 731, 108 Cal.Rptr. 845, 511 P.2d *502 1197, 1203 (1973)(imposing late fee against entire principal for delinquent installment). In In re Timberline Property Dev., Inc., 136 B.R. 382, 384 (Bankr.D.N.J.1992), the Bankruptcy Court refused to enforce a fixed percentage late fee, because the lender testified that the provision was intended to coerce performance by the borrower. In Ridgley v. Topa Thrift and Loan Assoc., 17 Cal.4th 970, 73 Cal.Rptr.2d 378, 953 P.2d 484, 485 (1998), the Supreme Court of California invalidated a provision that imposed a prepayment fee of six months interest if any payment was more than fifteen days late. Although the court found that provision "logically unrelated" to actual damages, it held "that would not be fatal, of course, if the amount of the pre-set charge constituted a reasonable attempt to estimate potential losses from late payment." Id. at 490.
The five percent late fee in this case was not unreasonable. Like the contract in Mattvidi, this loan involved an arms-length, fully negotiated transaction between two sophisticated commercial parties, each represented by counsel. MetLife presented uncontroverted testimony that the five percent late fee was well within the normal industry standard, and was intended to compensate for the administrative costs associated with servicing delinquent loan payments. Like the defendants in both Mattvidi and Travelers, Washington Avenue presented no evidence to overcome the presumptive reasonableness of the stipulated damages clause. There is no evidence of fraud, duress or other unconscionable acts on the part of MetLife.
Furthermore, case law from New Jersey and other jurisdictions suggests that a small percentage late charge on a commercial loan is simply part of the cost of doing business. A five percent fixed late charge negotiated between sophisticated commercial entities, is, in these circumstances, a valid measure of liquidated damages.[2] We, therefore, disagree with the conclusions of the Appellate Division concerning that fee.

C.
The default interest rate also was invalidated by the Appellate Division. The court relied primarily on the reasons it used to strike down the five percent late fee, although it also found that the trial court's reduction of the default interest rate to 12.55 percent was "entirely speculative." Metlife, supra, 313 N.J.Super. at 545, 713 A.2d 527.
Default interest rates, like late fees, are presumed reasonable. MetLife presented evidence that industry custom provides for default rates of fifteen percent to eighteen percent. The trial court set the enhanced rate in this case at 12.55 percent, an increase of three percent over the contract rate. MetLife did not appeal the trial court decision to reduce the default rate, and the Appellate Division did not consider the validity of a 15.55 percent rate. Thus, that rate is not before this Court.
Like late charges, default charges are subject to the reasonableness test. A default provision providing for an unreasonable increase in the contract interest rate is unenforceable as a penalty. See Stuchin, supra, 237 N.J.Super. at 612, 568 A.2d 907. New Jersey cases have invalidated enhanced default rates if their size suggests a punitive intent. Ibid. (remanding for consideration of reasonableness of fifteen percent increase); Spiotta v. Wilson, 72 N.J.Super. 572, 579, 179 A.2d 49 (App.Div.), certif. denied, 37 N.J. 229, 181 A.2d 12 (1962)(invalidating 8.58 percent increase from 30.18 percent to 38.76 percent); Feller v. Architects Display Buildings, Inc., 54 N.J.Super. 205, 214, 148 A.2d 634 (App.Div.1959)(invalidating *503 15.87 percent increase from seventeen percent to 32.87 percent).
In comparison, the three percent increase in this case is a reasonable estimate of the potential costs of administering a defaulted loan, and the potential difference between the contract interest rate and the rate that MetLife might pay to secure a commercial loan replacing the lost funds. See Stuchin, supra, 237 N.J.Super. at 614, 568 A.2d 907. Default charges are commonly accepted as means for lenders to offset a portion of the damages occasioned by delinquent loans. As with the costs of late payments, the actual losses resulting from a commercial loan default are difficult to ascertain. The lender cannot predict the nature or duration of a possible default given many possible causes of borrower delinquencies. Nor is it possible when the loan is made to know what market conditions might be ten or fifteen years hence and, thus, what might be recovered from a sale of the collateral. For example, a lender cannot know what its own borrowing costs will be if the borrower defaults in paying a loan in the future, nor accurately predict what economic return it will lose when the borrower fails to repay the loan on time or how much in costs it will incur if the property is foreclosed or the borrower files for bankruptcy. Additional sums required in the context of collection activity, such as travel costs, expert fees and the costs of its loan officers' involvement in collection activities are difficult to prove with respect to any specific loan at its outset. We, therefore, have adopted the "modern trend" that the reasonableness test is applied either at the time the contract is made or when it is breached. Wasserman's, supra, 137 N.J. at 251-52, 645 A.2d 100.
Because the trial court's default rate appears to be a reasonable estimate of potential damages, falls well within the range demonstrated to be customary, and because a stipulated damages clause negotiated between sophisticated commercial entities is presumptively reasonable, we do not sustain the conclusions of the Appellate Division with respect to the 12.55 percent default rate set by the trial court.

IV.
The final issue in this appeal involves an accounting for the rents collected directly from the tenant by MetLife. The Appellate Division held that MetLife's failure immediately to apply the rents to the principal balance due or to credit Washington Avenue for interest accrued on those rents violated the implied covenant of good faith and fair dealing. The court remanded for a determination of any credit due to Washington Avenue. We agree with that conclusion.
As the Appellate Division noted, MetLife may have secured an interest-free loan for itself at Washington Avenue's expense by directly collecting rents and failing either to apply them to the outstanding obligation or to credit interest to the debtor. Metlife, supra, 313 N.J.Super. at 536, 713 A.2d 527.
Under an absolute assignment of rents provision, title to the rents passes to the assignee upon default. IBM Corp. V. Axinn, 290 N.J.Super. 564, 568, 676 A.2d 552 (App.Div.1996). The assignee, however, may not deny the party in default an accounting of rents collected. Orange Land Co. v. Bender, 96 N.J.Super. 158, 166, 232 A.2d 679 (App.Div.1967) ("[a] mortgagee in possession is bound to account for all rents, issues and profits received by him. . . and must deduct the allowance for these matters from the amount due on the mortgage....")
In this case, MetLife made no accounting of the collected rents. Furthermore, the contract provision allows MetLife to "sue for or otherwise collect such Rents including those past due and unpaid, and apply the same, less costs and expenses of the operation of the Property, and of collection... to the payment of any of the Secured Obligations, in such order as *504 [MetLife] may determine." (emphasis added).
In the absence of any accounting, and in light of prior precedent, the express contractual provision, and considerations of equity, we are in accord with the Appellate Division's conclusion to remand the case for consideration of what credit, if any, Washington Avenue should receive for the collected rents.

V.
Late charges and default interest provisions constitute a practical solution to the problem of pricing loans according to anticipated rather than actual performance and the difficulty in allocating and determining the costs and damages of late payments and default. The alternatives are economically inefficient or judicially impracticable.
In Wasserman's, supra, 137 N.J. at 249, 645 A.2d 100, we reviewed the policies that favor the enforcement of liquidated damages clauses and the competing reasons that disfavor such clauses. We concluded that
[i]n commercial transactions between parties with comparable bargaining power, stipulated damage provisions can provide a useful and efficient remedy. Sophisticated parties acting under the advice of counsel often negotiate stipulated damages clauses to avoid the cost and uncertainty of litigation. Such parties can be better situated than courts to provide a fair and efficient remedy. Absent concerns about unconscionability, courts frequently need ask no more than whether the clause is reasonable.

[Id. at 253, 645 A.2d 100 (citations omitted).]
In addition to those reasons, "considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses." Wassenaar, supra, 331 N.W.2d at 362.
MetLife suggests that in view of today's fiercely competitive marketplace and because the liquidated damages analysis is complicated and ambiguous, we should supplant the traditional liquidated damages analysis in the commercial loan context by modern contract analysis. That late charge and default interest provisions are more properly characterized as variable-pricing provisions, a term of borrowing money, rather than as liquidated damages. As support they cite the United States Office of Thrift Supervision Interpretative Letter dated November 27, 1996, at 12-13. Courts also have recognized that default interest and late charge provisions are part of the pricing of commercial loans, and legitimately reflect the parties' agreement as to the increased risk of non-payment that the lender bears upon the occurrence of a default. See Citibank, N.A. v. Nyland (CF8) Ltd., 878 F.2d 620, 625 (2d Cir.1989) (finding default or "variable" interest rate reflects the heightened risk of nonpayment that creditor bears upon entry of default); Ruskin v. Griffiths, 269 F.2d 827, 832 (2d Cir.1959), cert. denied, 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960) (same); In re Route One West Windsor Ltd. Partnership, 225 B.R. 76 (Bankr.D.N.J.1998) (collecting authorities holding that default interest is not penalty, but rather compensation for increased risk).
Because default and late charges are not liquidated damages at all in the traditional sense, but are simply part of the pricing of commercial loans between sophisticated parties, MetLife asserts that in the absence of unconscionability or illegality, those charges should be enforced. We agree in today's competitive market that ordinarily such charges are part of the cost of doing business. We, however, prefer to incorporate that factor into the "reasonableness" test. Courts are accustomed to dealing with the standard of reasonableness. We think that standard rather than an "unconscionability" standard provides an adequate safeguard for the lenders and better protection for the borrowers.
*505 Accordingly, we find that the five percent late charge and 12.55 percent default rate set by the trial court are reasonable liquidated damages. We also conclude that a remand is necessary to properly account for the rents collect directly by MetLife. The judgment of the Appellate Division is affirmed in part, reversed in part, and the case is remanded for proceedings consistent with this opinion.
For affirmance in part; reversal in part; and remandmentChief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN7.
OpposedNone.
NOTES
[1] Collectively referred to as Washington Avenue.
[2] This holding applies only to commercial loan transactions and does not address the issue of enforceability of liquidated damage clauses in consumer contracts or in residential mortgages.