**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1449-19
      A-1583-19

CROWN BANK,

  Plaintiff-Respondent,

v.

WILLIAM REILLY,

  Defendant-Appellant,

and

KATHLEEN BOTBYL,
PATRICIA GARVEY,
MYLES R. GARVEY, JR.,
FEDERAL DEPOSIT
INSURANCE CORPORATION,
as receiver, STATE OF NEW
JERSEY, JERSEY CENTRAL
POWER & LIGHT COMPANY,
and UNITED STATES OF
AMERICA,

  Defendants.

_____

WILLIAM REILLY,

Plaintiff-Appellant,

v.

CROWN BANK,

Defendant-Respondent.

_____

Submitted January 25, 2021 – Decided March 15, 2021

Before Judges Sabatino and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket Nos. F-025780-17 and C-000173-16.

The Law Offices of Michael Botton, LLC, attorneys for appellant (Michael Botton and Leo Rishty, on the briefs).

Hill Wallack, LLP, attorneys for respondent (Eric I. Abraham and Victoria A. Flynn, of counsel and on the brief).

PER CURIAM

In this matter, William Reilly appeals from two Chancery Division orders arising out of his default under two loan agreements. We affirm.

In 2005, Reilly entered into two loan agreements with First BankAmericano.[1] The first loan was for the principal amount of $975,000 at an

---

[1] Respondent Crown Bank acquired all of First BankAmericano's assets in 2009, including Reilly's loans and mortgages.

initial adjustable interest rate of seven-and-a-half percent. Reilly secured the loan by executing a mortgage on a commercial property located in Ocean Grove (the Hotel). The second loan, with a principal amount of $172,500, was secured by a mortgage on an apartment building in Paterson (the Paterson property). Reilly was represented by counsel in both transactions.

The two loans were cross-collateralized. The loan documents included a due on sale clause providing the lender could "declare immediately due and payable all sums" secured by the mortgage upon the sale or transfer of either property. The documents also defined a "default" and stated that upon default, the variable interest rate would increase to eighteen percent.

In October 2012, Reilly transferred his interest in the Paterson property to a third party. He did not pay off the remaining balance on the loan. The third party, however, made timely payments that Crown Bank accepted until the loan was repaid in full.

On May 13, 2016, Crown Bank sent Reilly a letter notifying him he was in default under the terms of the first loan agreement. Reilly had not made the required monthly payment in April 2016. The letter informed Reilly that if he did not make the required payment, Crown Bank would exercise its right under the loan agreement to institute foreclosure proceedings, file suit to collect money

A-1449-19

damages, and increase the interest rate to the specified default interest rate. Reilly later made several payments towards the mortgage; the last one occurred in July 2016.

In July 2016, Reilly executed a contract for the sale of the Hotel. He sent a letter to Crown Bank requesting a payoff figure for the first loan. Crown Bank responded, informing Reilly the total payoff figure was $722,304.53 representing $592,422.36 in principal; $120,412.09 in interest calculated to August 22, 2016; $9,430.08 in late charges; and a $40.00 statement fee.

Through counsel, Reilly sent Crown Bank a letter on August 24, 2016 requesting a detailed summary of the interest calculations. Crown Bank advised the amount of interest in the payoff figure was calculated using the default interest rate of eighteen percent. The interest due reflected the retroactive application of the default interest rate to October 2012—when Reilly transferred the Paterson property without notice to Crown Bank and without paying off the loan.

In October 2016, Reilly filed a complaint in the Chancery Division seeking a declaration that the default interest rate was unreasonable and unenforceable. Crown Bank filed an answer and counterclaims, asserting Reilly breached the parties' contract and the covenant of good faith and fair dealing.

    A-1449-19

In June 2018, Crown Bank filed a motion for summary judgment seeking entry of judgment on its breach of contract counterclaim. Reilly cross-moved for summary judgment, seeking a declaration that the default interest rate was unreasonable, unconscionable, and unenforceable. After oral argument, the Law Division judge[2] denied both motions without prejudice because he found issues of fact remained as to the amount owed, date of default, and reasonableness of the default interest rate.

The court subsequently conducted a one-day bench trial in April 2019 during which Reilly and Crown Bank's chairman of the board and CEO testified.

On May 31, 2019, the judge issued a well-reasoned oral decision. He recounted the facts, which he stated were "really not in dispute." He also found there was "no dispute that . . . the properties were cross-collateralized and that . . . any transfer of the property would constitute a breach of the loan agreement."

In discussing the second loan, the judge noted Reilly "transferred his interest in the Paterson property to a third party" who "continued to make . . . loan payments [that] were accepted by [Crown Bank], and there [were] no damages associated with the [second] loan." He stated Crown Bank "received

---

[2] The presiding civil judge was assigned to hear this matter as the Chancery judge had a conflict.

A-1449-19

full payment on that loan from third parties" while Reilly "continued to make his loan payments under loan number [one]."

In addressing the first loan, the judge concluded "there [was] no dispute" and "no evidence" to the contrary that Crown Bank did not notify Reilly that it was "going to assess him [retroactively] . . . for approximately four years at an [eighteen] percent interest rate on the loan for the [Hotel], which had not been declared in default[.]"

The judge defined the legal issues before him as "when did the default occur and what damages were suffered; and what interest rate should apply to this transaction, when it should apply, and what the amount due should . . . be." The judge rejected Reilly's loss of profit claim for the sale of the Hotel, finding Reilly had not properly pled the claim and failed to present any proof to "substantiate a valid claim for the loss of the sale of [the] property."

The judge next considered the contractual issues. He found "the loan documents themselves indicate" that the transfer of the Paterson property "was a technical default under the terms of the mortgage documents[,] [a]nd since there was a cross-collateralization," the transfer of the Paterson property also constituted a default on the first loan. However, because Crown Bank "continued to receive timely mortgage payments by the third party and the

6

Paterson [property] loan was satisfied in full[,]" Crown Bank did not sustain any damage as a result of the default on the second loan.

However, because Reilly stopped making payments on the first loan, the judge found Reilly "defaulted on the terms of the note and the mortgage" for the Hotel. Therefore, the judge turned to a consideration of whether Crown Bank could retroactively apply the default interest rate of eighteen percent to Reilly's transfer of the Paterson property in October 2012.

In noting Crown Bank was obligated under the loan documents "to provide reasonable notice of a default and a reasonable opportunity to cure any alleged default[,]" the judge concluded Crown Bank had not done so. Instead, Crown Bank retroactively applied the "eighteen percent interest [rate] four years before [giving] any notice to [Reilly]." The judge further concluded that such conduct was "not in accordance with [Crown Bank's] obligation to deal with its customers in good faith" nor with its obligation under the loan agreement and was "simply fundamentally unfair." Therefore, the court reasoned the retroactive application of the default interest rate was illegal and unenforceable.

Next, the judge considered whether the eighteen percent default interest rate was enforceable. In finding the "parties voluntarily contracted" for the default interest rate, he concluded the interest rate was "fair, reasonable, and in

7

accordance with what is usual and customary." The court noted that Crown Bank had to pay eighteen percent interest to redeem the tax liens on the Hotel. The judge stated the higher interest rate in the parties' contract was "designed not to be punitive, but it is designed to provide compensation for a . . . [defaulted] obligation and the steps, efforts and delay associated with receiving some satisfaction for the underlying obligation."

However, the judge found the default rate could not be imposed "prior to what the [c]ourt determines to be the date of default on the underlying obligation." He concluded the date of default was July 2016, the date of Reilly's last payment on the first loan. Accordingly, the judge found Reilly owed Crown Bank: $592,422.36 in principal, $9,430.80 in late fees, a statement fee of $40.00, tax liens in the amount of $132,590, plus eighteen percent interest calculated from July 2016. The court denied the parties' respective requests for counsel fees and costs. The oral decision was memorialized in a June 19, 2019 order.

On October 11, 2019, the court entered final judgment in the amount of $1,057,503.79 (as of August 28, 2019) plus per diem interest at the rate of $296.21.

During the pendency of this litigation, Crown Bank filed a complaint seeking to foreclose on the Hotel. In addition to defaulting on the mortgage

A-1449-19

payments, Reilly had not paid the property taxes or water and sewerage charges since 2013. Reilly did not answer the complaint. A subsequent motion to vacate the default was denied.

Following the June 19, 2019 order, Crown Bank moved for final judgment on the foreclosure complaint. The transcript of the Law Division judge's oral decision was not included with the motion.

The Foreclosure Unit denied the motion, stating Crown Bank had not pled a default rate of interest in the complaint and the Unit could not accept an order from the Law Division for a default interest rate in a Chancery decision matter. The Unit instructed Crown Bank to amend the complaint to include the default rate of interest and to provide a breakdown of what the interest would have been at the variable rate.

Crown Bank re-filed its motion for final judgment, including the May 31, 2019 transcript. Reilly opposed the motion. On November 14, 2019, the parties appeared before the Chancery court where the current Chancery judge heard oral argument.

In addressing the concerns raised by the Foreclosure Unit, the Chancery court stated Crown Bank had rectified its application and alleviated the concerns by providing the transcript of the Law Division's decision. In addition, the

A-1449-19

Foreclosure Unit was mistaken in an aspect of its statement as Crown Bank indicated in its complaint that it was only seeking the default interest rate of eighteen percent, and not looking to add to the contract interest rate. And, the Law Division judge was sitting as the conflict judge in the Chancery matter and had issued his decision and order under the Chancery docket.

In considering Reilly's argument regarding the default interest rate, the Chancery court stated: "this [c]ourt finds no reason to revisit the [Law Division's] decision as to the interest rate and hereby adopts it." The court found that "res judicata applie[d] here to bar any relitigation of that issue," stating:

> [T]he issue of interest again was addressed in . . . [the] June 19, 2019 order and ultimately in the order for final judgment entered on October 11, 2019. Thus, the issue was addressed by a court of competent jurisdiction by way of final judgment. There clearly was an identity of issues. The default interest rate was directly at issue in that case and now again in [Reilly's] opposition to the motion for final judgment in this case. The parties are the same.

Therefore, "the [c]ourt f[ound] that by the application of res judicata, the [eighteen] percent interest rate applies here." "[E]ven [if] res judicata would not apply[,] having read [the Law Division's] reasoned and thorough decision, the [c]ourt would have no reason to reach any other conclusion than the conclusion that he reached and thus would adopt it."

A-1449-19

The court granted final judgment on November 19, 2019 in the amount of $1,030,850.06, including "interest at the contract default rate of $362.51 per day from and including June 26, 2019, through to the date of this [j]udgment, plus lawful interest on the total sum due thereafter, together with costs of this action."

On appeal, Reilly asserts the Law Division judge erred in finding the eighteen percent default interest rate was valid and enforceable. And, the Chancery court erred in relying on the prior ruling to enter final judgment.

"The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by adequate, substantial and credible evidence." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (citations omitted). Such deference is especially due when a trial judge's findings "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy." Zaman v. Felton, 219 N.J. 199, 216 (2014) (alteration in original) (citation omitted). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

Our Supreme Court established the standard by which the validity of default interest rate provisions is determined in MetLife Capital Fin. Corp. v. Washington Ave. Assocs. L.P., 159 N.J. 484, 495 (1999). In MetLife, the Court considered whether a commercial mortgage with a default interest rate of 12.55 percent—three percent higher than the contract rate of nine percent—was enforceable. Id. at 489. The Court held that "[t]he overall single test of validity is whether the [default interest] clause is reasonable under the totality of the circumstances." Id. at 495 (alteration in original). It further noted that while no one factor is dispositive, courts should consider "the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties." Ibid.

In considering whether a default interest rate is reasonable under the totality of the circumstances, the Court "observe[d] that [default interest] provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." Id. at 496. The Court noted that "[d]efault charges are commonly accepted as means for lenders to offset a portion of the damages occasioned by delinquent loans." Id. at 501. In addition, MetLife presented "evidence that industry custom provides for default rates of fifteen

12

percent to eighteen percent." Ibid. It also noted that "the actual losses resulting from a commercial loan default are difficult to ascertain." Ibid.

In concluding the default interest rate was valid and enforceable, the Court stated the "loan involved an arms-length, fully negotiated transaction between two sophisticated commercial parties, each represented by counsel[,] [and] [t]here [was] no evidence of fraud, duress or other unconscionable acts." Id. at 500. Further, the party challenging the default interest rate was unable to overcome the presumption of reasonableness and the "rate appear[ed] to be a reasonable estimate of potential damages [and] f[ell] well within the range demonstrated to be customary." Id. at 502.

The Court reasoned that "default [interest rates] are not liquidated damages at all in the traditional sense, but are simply part of the pricing of commercial loans between sophisticated parties," and "in the absence of unconscionability or illegality, those [rates] should be enforced." Id. at 504-05. While the Court "agree[d] in today's competitive market that ordinarily such [rates] are part of the cost of doing business[,]" it nevertheless declined to impose an unconscionability standard, reasoning "[c]ourts are accustomed to dealing with the standard of reasonableness." Id. at 505.

A-1449-19

Here, the Law Division judge concluded that the eighteen percent default interest rate was "fair, reasonable, and in accordance with what is usual and customary." He reasoned that the "parties voluntarily contracted" for the terms of the loan, including the default interest rate provision. The judge also noted the higher rate was "designed not to be punitive, but it is designed to provide compensation for a . . . [defaulted] obligation and the steps, efforts and delay associated with receiving some satisfaction for the underlying obligation."

The court's reasoning was supported by Reilly's testimony, in which he confirmed he was represented by counsel during the loan transactions and that he signed the loan agreement only after reading it and understanding its terms. Moreover, Crown Bank's chairman of the board and CEO testified regarding the increased time, effort, and cost associated with servicing a defaulted loan obligation.

As stated, because the loan agreement here involved a transaction between two sophisticated parties represented by counsel, Reilly bears the burden of overcoming the presumption in favor of the validity of the interest rate. See id. at 496. We are satisfied he has not presented sufficient evidence to overcome this presumption.

 A-1449-19

Reilly has not demonstrated that the increase in the interest rate was not justified to compensate Crown Bank for the costs associated with servicing his defaulted loan obligation. He also did not present any evidence or cite to any authority to demonstrate that a default interest rate of eighteen percent was contrary to industry practice or otherwise unreasonable. There was no showing of fraud, duress, or any unconscionable conduct.

Reilly has not established there was any reason for the trial court to view the loan agreement as anything other than an arms-length transaction between sophisticated, represented parties. Indeed, this was precisely the sort of transaction for which our Supreme Court declared higher default interest rates to be "part of the cost of doing business." Id. at 504. Moreover, the default interest rate here of eighteen percent fell within the range of industry custom noted in MetLife. Id. at 501. Reilly has not refuted the presumption of validity afforded to the default interest rate.

Reilly further contends the increase in his interest rate from the initial seven-and-a-half percent to eighteen percent was per se unreasonable under New Jersey law. However, our courts have declined to establish a per se rule regarding the reasonableness of a default rate. In fact, Reilly's assertion is contradicted by the Court's test presented in MetLife; determining whether a

default interest rate is valid turns on an assessment of reasonableness under the totality of the circumstances in each case. Id. at 495-96. Therefore, there is no per se rule regarding increases in default interest rates given the fact-intensive nature of the required inquiry. In addition, since rates of interest change over time, what may be reasonable at one point in time may not be reasonable at another. Therefore, the MetLife test is sound as it is fluid with the financial circumstances in existence and sensitive to the circumstances of each case.

Because we are satisfied there was no error in assessing the enforceability of the default interest rate, we see no reason to disturb either the June 19, 2019 or November 14, 2019 order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1449-19