774 A.2d 476

DR. LEO TROY, DR. STAN HALL, DR. ERNST U. MONSE, DR. HUGH THOMPSON, DR. IRWIN ROTHBERG, DR. DANIEL WILHOFT AND DR. IRWIN PRIMER, PLAINTIFFS–APPELLANTS, v. RUTGERS, THE STATE UNIVERSITY, DEFENDANT–RESPONDENT.

Argued February 14, 2001—Decided June 20, 2001.

*Michael H. Sussman*, a member of the New York bar, argued the cause for appellants (*John P. Brennan, Jr.*, attorney).

*John J. Peirano, Jr.* argued the cause for respondent (*Carpenter, Bennett & Morrissey*, attorneys; *Mr. Peirano, Kevin C. Donovan* and *Seth Ptasiewicz*, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

This employment dispute requires us to decide whether plaintiffs presented sufficient evidence to establish the existence of individual agreements with defendant and, if so, whether those individual agreements were superseded by a collective agreement.

Plaintiffs, seven tenured Rutgers University Newark faculty members, allege that defendant Rutgers University unilaterally changed their employment status from calendar-year appointments to academic-year appointments in breach of their individual agreements. The Appellate Division held that the professors did not provide sufficient evidence of individual agreements and, even if they had, the collective agreement generally would prevail over any individual agreements. The court also concluded that the dispute was a matter of managerial prerogative, such that it could be resolved only through non-binding advisory arbitration under the collective agreement. We disagree, and therefore reverse and remand.

## I

Plaintiffs, seven tenured members of the Rutgers University Newark Faculty of Arts and Sciences, allege that defendant University unilaterally changed their employment status from calendar-year (CY) appointments to academic-year (AY) appointments in breach of their individual agreements. The alleged individual agreements are independent of the collective negotiations agreement negotiated between defendant and the American Association of University Professors (AAUP) that governs the terms and conditions of employment of University faculty members.[1]

By 1991, each plaintiff had held a CY appointment for at least twenty years. A CY appointment, under the collective agreement, means that the faculty member is "expected to" devote the entire year to his or her University duties with the exception of a one-month vacation. An AY appointment, in contrast, "requires" the faculty member to be in attendance from September 1 to the date of commencement. Defendant and the AAUP negotiated two separate salary schedules for AY and CY appointees, with CY appointees receiving more favorable pay.

In March 1992, David Hosford, Dean of Rutgers Newark's Faculty of Arts and Sciences, advised plaintiffs that, unless they maintained sufficient duties to satisfy CY criteria, i.e., duties that occupy their time for eleven months of the year, their appointments would be changed to AY status effective July 1992. Plaintiffs objected, arguing that their CY appointments were made without conditions attached to those appointments, such that they had no obligation to perform specific duties beyond the academic year. Plaintiffs contended at that time, and assert here, that defendant elected to "grandfather" their appointments so as to

---

[1] In public sector labor relations in New Jersey, courts use the terms "collective negotiation" and "collective negotiations agreements" rather than "collective bargaining" and "collective bargaining agreements." *N.J. Tpk. Employees Union v. N.J. Tpk. Auth.*, 64 *N.J.* 579, 581, 319 A.2d 224 (1974).

exclude them from any requirement that they work beyond the academic year.

In support of their argument, plaintiffs point to, among other proofs: (1) the deposition of George Horton, a professor and former AAUP representative, who testified that University officials intended to grandfather the appointment status of CY appointees during Union negotiations with defendant in the early 1970s; (2) the deposition of Wells Keddie, a former AAUP President, who testified that the AAUP and defendant had an unwritten understanding that although the University discussed ending the practice of making "unconditional" CY appointments, existing CY appointees would be grandfathered from any changes; (3) the appointment history of other University faculty members indicating that defendant unsuccessfully attempted to alter their CY appointments to AY appointments, presumably because of the agreement to grandfather unconditional CY appointees; and (4) the appointment history of each of the seven plaintiffs, including evidence that suggests in part that defendant was aware that plaintiffs maintained CY appointment status even though they at times did not devote the entire year to University duties.

Further, plaintiffs argue that a July 1984 memorandum from T. Alexander Pond, then Executive Vice President of Rutgers University, established a policy that insulated CY appointees such as plaintiffs from any changes to the conditions of employment of faculty members. That memo (the Pond Memorandum) was addressed to Provosts and Deans and states:

> The University Senate recently considered the question of calendar year appointments and provided the President with advice that formalized in writing what has essentially been our practice for some time in regard to such appointments. That advice was reviewed by the Board of Governors.
>
> Set forth below is the statement regulating calendar year appointments which was adopted by the Senate and which I am now promulgating as the University's policy in regard to calendar year faculty appointments:
>
> 1. All persons initially appointed and/or tenured on *calendar year appointments* without conditions attached to those appointments *shall continue to hold those appointments, unless an entire class of said appointments is reduced.*

2. No further calendar year appointments without specific written conditions shall be made.

3. Non-administrative calendar year appointments shall be made only in instances where the special circumstances of the faculty member's academic work require her/his presence on campus (or usual place of work), on a year-long basis.

4. When the conditions which led to the new calendar year appointment no longer apply, the appointment shall revert to an academic year appointment.

Please note that point number 1. above should *not* be construed to mean that initial appointment on a calendar year basis without conditions eliminates the obligation of a faculty member to be engaged in his or her professional duties at the University during the full term of his or her appointment, nor should it be construed to mean that a faculty member and his or her chairperson and dean cannot agree to reduce an appointment from calendar year to academic year. In regard to point number 2., the specific written conditions should be understood to refer to an explicit statement of the professional responsibilities entailed by the calendar year appointment.

[ (Second emphasis added).]

Plaintiffs filed a grievance in May 1992 through the AAUP, pursuant to the collective agreement. Parenthetically, we note that the grievance procedure delineated under this collective agreement is different from similar procedures contained in private-sector collective bargaining agreements covering, for instance, factory workers or construction workers. Nor is this grievance procedure typical of that contained in most collective agreements in the public sector, such as those covering police officers, fire officers, or K–12 teachers. The standard grievance procedure in those agreements usually consists of a few paragraphs. The intricate grievance procedure in this collective agreement consumes twenty-three single-spaced pages of the fifty-three page contract.

The agreement states that either the AAUP or a faculty member can file a grievance. The grievance procedure begins at "Step One," in which University personnel conduct their own investigation resulting in a written response to the grievant. If dissatisfied with the disposition of the grievance at Step One, the AAUP or the grievant ordinarily has thirty working days from the receipt of the Step One decision to appeal the grievance to "Step Two," which is arbitration.

Here, the AAUP, on behalf of plaintiffs, started Step One of the grievance procedure by alleging in a letter to defendant that its unilateral change of plaintiffs' appointments was a violation of the collective agreement and University regulations and policies. In an August 1992 memorandum, the University's Assistant Vice President for Faculty Affairs denied the grievance, stating in part that "[t]he seven grievants were the only FAS faculty who were performing academic year assignments while being paid for calendar year appointments. All other calendar year appointees, regardless of age, have calendar year assignments."

In October 1992, the AAUP appealed that denial to Step Two arbitration. Plaintiffs argued that the dispute was a "Category One" grievance under the collective agreement; defendant argued that it was a "Category Two" grievance. A Category One grievance alleges that the University violated mandatorily-negotiable terms and conditions in the collective agreement. A Category Two grievance generally does not involve a violation of the collective agreement itself, but instead alleges that the University violated policies, other agreements, or regulations affecting mandatorily-negotiable terms. Unlike a Category One grievance that is resolved in binding arbitration, a Category Two grievance is resolved by "advisory arbitration," in which an arbitrator issues an advisory recommendation to the Office of the President, who is charged with issuing a final and binding determination. Article XXII of the collective agreement defines AY and CY appointments and states that grievances under that Article are Category Two grievances.

In March 1994, the arbitrator concluded that the dispute fell under Article XXII of the collective agreement and thus was properly characterized as a Category Two grievance subject only to advisory arbitration. Plaintiffs decided not to pursue advisory arbitration.

In the meantime, plaintiffs had instituted an action against the University in December 1992 in the United States District Court for the District of New Jersey, alleging age discrimination, 29

*U.S.C.A.* § 621, violations of due process rights, and common-law breach of contract. In 1995, the Honorable William G. Bassler, U.S.D.J., granted defendant's motion for summary judgment on the discrimination and due process claims. In denying summary judgment on the breach of contract claim, the court observed:

> A genuine issue of material fact exists as to whether there was a contract preventing reversion of historic calendar year appointments to academic year appointments. A reasonable jury provided with the plain language of the [collective agreement], the 1984 policy statement, the evidence of Rutgers' response to prior challenges to the "historical" calendar year appointments and the testimony of Keddie and Horton regarding the unwritten agreement could find for either party. Consequently, summary judgment on this issue is denied.

Nevertheless, the court dismissed the breach of contract claim without prejudice, citing an insufficient basis to exercise pendent jurisdiction. The Third Circuit affirmed. *Troy v. Rutgers, The State, Univ.,* No. 95–5805, 92 F.3d 1173 (3d Cir. June 10, 1996).

Plaintiffs filed this breach of contract action in the Law Division in October 1996. Plaintiffs and defendant filed summary judgment motions, both of which were denied. Defendant then filed a motion for leave to file an interlocutory appeal with the Appellate Division. The Appellate Division denied defendant's motion without prejudice and remanded the matter to the Law Division for a statement of reasons underlying its decision. In response, the motion court stated that there were a number of material facts at issue, including

> whether these plaintiffs were "grandfathered" into calendar year appointments (defendant maintaining such wording was never included in the AAUP agreement; plaintiffs submitting deposition testimony that the acts and conduct of Rutgers supports their position).

> A fact finder must determine whether or not the acts and conduct of the defendant created a binding agreement between the parties and if not a determination as to whether or not the defendant had the right to terminate the status of the seven plaintiffs from a calendar term to an academic term along with justifiable reasons which would include a question as to whether or not these seven plaintiffs constituted an entire class. There is also conflicting certification facts and deposition testimony as to what the agreement was with regard to the work, as to where and how these plaintiffs were to spend the summer months. A reasonable jury must make a determination. The [c]ourt cannot as a matter of law rule in either direction and thus both plaintiffs' motion and defendant's motion are denied.

Defendant subsequently filed a second motion for interlocutory review with the Appellate Division. The Appellate Division denied defendant's motion, but remanded the matter to the Law Division for disposition of defendant's argument that the alleged individual agreements were superseded by the collective agreement. Accordingly, on remand, the motion court concluded that there was a fact issue concerning whether plaintiffs were grandfathered into unconditional calendar-year appointments and exempt from any conflicting provisions under the collective agreement. Defendant then filed a renewed motion for leave to appeal with the Appellate Division. The Appellate Division granted that motion.

The Appellate Division held that plaintiffs did not have individual contract rights and that any other rights asserted were to be governed by the collective agreement. The Appellate Division was not persuaded that the testimony of Horton and Keddie, the individual employment histories of plaintiffs, or the Pond memorandum created a contract right. Rather, the court held that the collective agreement and University regulations fully described the obligations of a CY appointee and that the collective agreement thus superseded any separate agreements between plaintiffs and defendant. The court also concluded that the matter was one of managerial prerogative subject to advisory arbitration under the collective agreement. The court therefore reversed and remanded the matter for entry of judgment dismissing the complaint without prejudice to the rights plaintiffs had under the collective agreement.

Plaintiffs sought certification, which this Court granted. 165 *N.J.* 602, 762 *A.*2d 217 (2000). We now reverse.

II

We first address whether there exist genuine issues of material fact relating to whether defendant created an enforceable obligation permitting plaintiffs to maintain their CY appointments. *R.* 4:46–2.

■ An employment contract may be formed by the existence of conditions, not only manifested by words, but also implied from the circumstances of employment. *White v. Atlantic City Press,* 64 *N.J.* 128, 133, 313 *A.*2d 197 (1973); 27 *Am.Jur.2d Employment Relationship* § 13 (1996). Oral promises, representations, employee manuals, or the conduct of the parties, depending on the surrounding circumstances, have been held to give rise to an enforceable obligation on the part of an employer. *See, e.g., Wanaque Borough Sewerage Auth. v. Township of West Milford,* 144 *N.J.* 564, 574, 677 *A.*2d 747 (1996) ("Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances."); *Shebar v. Sanyo Bus. Sys. Corp.,* 111 *N.J.* 276, 289, 544 *A.*2d 377 (1988) (holding that material issue of fact existed concerning whether employer orally promised to discharge employee only for cause); *Gilbert v. Durand Glass Mfg. Co.,* 258 *N.J.Super.* 320, 329–30, 609 *A.*2d 517 (App.Div.1992) (finding that oral representation by employer can support implied contract claim); 30 *C.J.S. Employer–Employee* § 24b (1992) (describing employment contract as "not only what is expressly stated, but also what is necessarily implied from the nature of the relationship created").

■ Implied contract terms generally are considered as binding as express contract terms. See *Wanaque Borough Sewerage Auth., supra,* 144 *N.J.* at 574, 677 *A.*2d 747 ("[C]ontracts implied in fact are no different than express contracts."); *Restatement (Second) of Contracts* § 19 cmt. a (1981) ("[T]here is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others."). *But see Jackson v. Georgia–Pacific Corp.,* 296 *N.J.Super.* 1, 15, 685 *A.*2d 1329 (App.Div.1996) (holding that employment manual's express disclaimer superseded alleged implied contractual term), *certif. denied,* 149 *N.J.* 141, 693 *A.*2d 110 (1997). The recognition of implied-in-fact contract provisions is contrary to " 'the common law presumption that the parties' writing and the official law of contract are the definitive elements of the agree-

ment.'" *Foley v. Interactive Data Corp.* 47 *Cal.*3d 654, 254 *Cal.Rptr.* 211, 765 *P.*2d 373, 386 (1988) (quoting Goetz & Scott, *The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms* 73 *Cal. L.Rev.* 261, 273–276 (1985)). The modern view is that, "[j]ust as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances." *Restatement (Second) of Contracts* § 4 cmt. a (1981).

■ Whether the parties acted in a manner sufficient to create implied contractual terms is a question of fact generally precluding summary judgment. See *Reynolds v. Palnut Co.*, 330 *N.J.Super.* 162, 171–72, 748 *A.*2d 1216 (App.Div.2000) (holding summary dismissal of breach of implied employment contract claim inappropriate where factual issue over existence of oral policy). As the court noted in *Giudice v. Drew Chem. Corp.*, 210 *N.J.Super.* 32, 36, 509 *A.*2d 200 (App.Div.), *certif. denied,* 104 *N.J.* 465, 517 *A.*2d 449 (1986), summary judgment ordinarily is not appropriate in an implied employment contract claim because "factual questions will persist concerning the meaning and intent of certain documents relevant to [such] a decision." *See also Witkowski v. Thomas J. Lipton, Inc.*, 136 *N.J.* 385, 399, 643 *A.*2d 546 (1994) (concluding that jury should determine whether employee could reasonably expect job security from employment manual); *Labus v. Navistar Int'l Transp. Corp.*, 740 *F.Supp.* 1053, 1063 (D.N.J.1990) (observing that, under New Jersey law, "[t]he legitimacy of the representations and the reasonableness of the employee's reliance are questions for the finder of fact that are not appropriate for summary judgment"). Of course, when no reasonable juror could reach other than one conclusion, the question of whether a document constitutes an implied contract may be resolved in a motion for summary judgment. Rosemary Alito, *New Jersey Employment Law,* § 1–6:2 at 20 (2d ed.1999). *See also Ware v. Prudential Ins. Co.*, 220 *N.J.Super.* 135, 146–47, 531 *A.*2d 757 (App.Div. 1987) (holding that court erred as matter of law in failing to enter

judgment for employer at close of plaintiff's implied employment contract action), *certif. denied,* 113 *N.J.* 335, 550 *A.*2d 450 (1988).

In *Shebar v. Sanyo Bus. Sys. Corp., supra,* this Court distinguished an implied contract action based on a company-wide policy under *Woolley v. Hoffmann–La Roche,* 99 *N.J.* 284, 491 *A.*2d 1257 (1985), *modified on other grounds,* 101 *N.J.* 10, 499 *A.*2d 515 (1985), from an implied contract claim that is based on representations made to a particular employee. 111 *N.J.* at 288, 544 *A.*2d 377. The plaintiff in *Shebar* was hired as an at-will employee but alleged that, after he attempted to resign to accept another job offer, his employer orally promised him that if he stayed he would have a job for life and that he would not be fired without cause. *Id.* at 282–84, 544 *A.*2d 377. The plaintiff was fired four months later and subsequently filed a claim for breach of oral contract of employment. *Id.* at 283, 544 *A.*2d 377. The Appellate Division held that the plaintiff could prove under *Woolley* that his employer created an oral company-wide policy that permitted him to be fired only for cause. *Id.* at 284, 544 *A.*2d 377. This Court affirmed on different grounds. Rather than relying on *Woolley,* the *Shebar* Court held that the plaintiff's circumstances created a "special contract with a particular employee, not a general agreement covering all employees." *Id.* at 288, 544 *A.*2d 377. The Court explained that while *Woolley* concerned a company-wide policy, defendant's alleged oral promise to the plaintiff was "made *specifically to him." Id.* at 284, 544 *A.*2d 377.

The *Shebar* Court therefore declined to apply *Woolley* 's implied contract analysis to the facts of that case or to consider whether to extend *Woolley* to oral company-wide policies.[2] Whereas *Woolley*

---

[2] *Shebar* did not preclude a finding of an implied contract based on oral communications of company-wide policy. A number of decisions subsequent to *Shebar* have adopted the Appellate Division's view that oral *Woolley* claims are permissible. *Reynolds v. Palnut Co., supra,* 330 *N.J.Super.* at 171–72, 748 *A.*2d 1216; *Gilbert v. Durand Glass Mfg. Co., supra,* 258 *N.J.Super.* at 329–30, 609 *A.*2d 517; *Fischer v. Allied Signal Corp.,* 974 *F.Supp.* 797, 807–08 (D.N.J.1997)

held that an employee's continued work in reliance on the employer's promise of job security contained in such a manual was sufficient consideration for contractual purposes, 99 *N.J.* at 303, 491 *A.*2d 1257, the *Shebar* Court held that the plaintiff's breach of contract claim "should be analyzed by those contractual principles that apply when the claim is one that an oral employment contract exists." *Id.* at 288, 544 *A.*2d 377. Although the Court did not discuss those principles, it cited with approval *Shiddell v. Electro Rust–Proofing Corp.*, 34 *N.J.Super.* 278, 112 *A.*2d 290 (App.Div. 1954), *certif. denied,* 17 *N.J.* 408, 111 *A.*2d 527 (1955), which observed that, within the context of an alleged oral promise for long-term employment, the creation of an implied contract depends on "[t]he intent of the parties [that] may be ascertained from the language employed, from all attending circumstances, and from the presence or absence of the giving by the employee of consideration additional to the services incident to his employment." *Id.* at 289, 112 *A.*2d 290. That analysis therefore differs from the implied employment contract analysis under *Woolley* in which consideration "shall be presumed." 99 *N.J.* at 307, 491 *A.*2d 1257.

*Shebar* further held that the plaintiff's claim for a lifetime contract was barred by *Savarese v. Pyrene Mfg. Co.*, 9 *N.J.* 595, 89 *A.*2d 237 (1952), which required that "a contract for lifetime employment be demonstrated by unmistakably clear signs of the employer's intent." *Id.* at 287, 544 *A.*2d 377. After reciting the pronouncement in *Savarese* that contracts for lifetime employment are "at variance with general usage and sound policy," the *Shebar* Court found the plaintiff's claim of a promise to discharge only for cause distinguishable from a lifetime employment claim because the latter claim "protects the employee only from arbitrary termination." *Ibid.* The Court held that summary judgment was not appropriate because a fact finder could determine that the alleged representations made to the plaintiff were intended to induce him

(applying New Jersey law); *Labus v. Navistar Int'l. Transp. Corp., supra,* 740 *F.Supp.* at 1062 (same).

to remain with the employer and were relied on by him in declining an offer from another company. *Id.* at 288–89, 544 *A.*2d 377. The Court concluded that a fact finder could determine that "additional consideration" was given because the plaintiff relinquished a competing job offer and the employer, in exchange, relinquished its right to terminate his employment at will. *Id.* at 289, 544 *A.*2d 377. *Shebar* applies retroactively. See *Smith v. Squibb Corp.,* 254 *N.J.Super.* 69, 73, 603 *A.*2d 75 (App.Div.) ("New Jersey has acknowledged for over three-quarters of a century that an act or promise of forbearance may be sufficient consideration to support an alleged oral contract of employment."), *certif. denied,* 130 *N.J.* 10, 611 *A.*2d 649 (1992).

In this case, plaintiffs' action is more akin to a breach of an individual implied contract of employment claim under *Shebar* than it is to a *Woolley* claim. The circumstances surrounding plaintiffs' complaint suggest that defendant made promises that were specific to plaintiffs, namely, that they were allowed to hold special status as unconditional CY appointees. Plaintiffs claim that only twenty percent of University-wide faculty members hold CY appointments. Of those faculty members, the record is silent regarding the percentage who hold CY appointments but do not work for the entire calendar year. Nevertheless, in denying plaintiffs' initial grievance, defendant claimed that as of August 1992 plaintiffs "were the only FAS faculty who were performing academic year assignments while being paid for calendar year appointments." Moreover, as defendant correctly points out, plaintiffs' claim rests largely on the allegation that after they were appointed on a CY basis, defendant made a decision, unique to each plaintiff, not to alter their CY appointments until 1992. That decision, according to plaintiffs, was made despite defendant's awareness that each plaintiff had not performed responsibilities during the course of an entire calendar year. Under those circumstances, we are convinced that the situation here involves an alleged "special contract" with each individual plaintiff. *Shebar, supra,* 111 *N.J.* at 288, 544 *A.*2d 377.

Plaintiffs point to the Pond Memorandum, the deposition testimony of Horton and Keddie, and the University's action towards other CY appointees as evidence that defendant had a University-wide policy under *Woolley* with regard to unconditional CY appointees. Because plaintiffs do not assert that those alleged actions and representations were communicated to the workforce, or even that there was general awareness of those actions, those proofs generally do not support a claim under *Woolley*. 99 *N.J.* at 302–04, 491 *A.*2d 1257. Nevertheless, because the surrounding circumstances are relevant in deciding whether the parties intended an individual implied employment contract to exist, those proofs may demonstrate that defendant's alleged agreement not to challenge plaintiffs' appointment status was consistent with a long-standing practice not to change the status of all unconditional CY appointees. *Shebar, supra,* 111 *N.J.* at 290, 544 *A.*2d 377; *N.J.R.E.* 401.

We also see no barrier to the recognition of plaintiffs' implied contract action because it concerns a change of work schedule and attendant reduction in pay. Although both *Shebar* and *Woolley* involve implied contracts that protect the employee against arbitrary termination, the principle of holding an employer responsible for the promises it chooses to make to its employees is equally applicable to other terms and conditions of employment and personnel decisions. *See, e.g., Marzano v. Computer Science Corp.,* 91 *F.*3d 497, 512 (3d Cir.1996) (applying New Jersey law in determining whether memo concerning maternity leave gave rise to enforceable obligation); *Kennedy v. Chubb Group of Ins. Cos.,* 60 *F.Supp.*2d 384, 399 (D.N.J.1999) (applying New Jersey law in deciding whether employer's short-week program given contractual force); *Barone v. Leukemia Soc. of Am.,* 42 *F.Supp.*2d 452, 457 (D.N.J.1998) (applying New Jersey law in noting employee handbook may create binding obligations concerning sick leave or bereavement leave); *Giuntoli v. Garvin Guybutler Corp.,* 726 *F.Supp.* 494, 508 (S.D.N.Y.1989) (holding that plaintiff may proceed with implied contract for bonus claim based on employer's written policies, course of dealing between parties, and oral repre-

sentations made to plaintiff); *Scott v. Pac. Gas and Elec. Co.*, 11 *Cal.*4th 454, 46 *Cal.Rptr.*2d 427, 904 *P.*2d 834, 839 (1995) ("[T]here is no rational reason why an employer's policy that its employees will not be demoted except for good cause, like a policy restricting termination or providing for severance pay, cannot become an implied term of an employment contract."); *Sledge v. New Haven Coliseum Auth.*, 1996 *WL* 548163 (Conn.Super.1996) (recognizing employee's right to establish implied contract governing right to annual performance evaluations and wage and benefit reviews); *Popovich v. Bekaert Corp.*, 222 *Ga.App.* 395, 474 *S.E.*2d 286, 288 (1996) (holding that employee may claim contract created based on employer promise of severance pay to employee).

The Appellate Division held that the evidence could not support a determination that defendant's conduct created a contract right. We disagree. A fact finder could conclude that defendant promised not to change plaintiffs' alleged status as unconditional CY appointees. Certain faculty CY appointments apparently were made without conditions. Although defendant alleges it eventually wished to ensure that CY appointees would be obligated to work past the academic year, a fact finder could conclude that defendant may have been willing to insulate plaintiffs from any such requirement. Plainly stated, a fact finder may conclude that defendant promised plaintiffs individually that their status as CY appointees did not hinge on the performance of specific duties beyond the academic year and that that promise was intended to induce plaintiffs to remain at the University. Further, a fact finder could conclude that that arrangement could constitute valuable consideration, namely, that plaintiffs enjoyed unconditional CY status and, in exchange, defendant enjoyed plaintiffs' decision to remain at Rutgers rather than to seek employment elsewhere. *Shebar, supra*, 111 *N.J.* at 289, 544 *A.*2d 377.

We hold therefore that evidence exists to support plaintiffs' position that their appointment status was in the nature of an enforceable contractual obligation. We find it persuasive that the federal district court, in its thoughtful opinion, determined that

summary judgment was not appropriate on that issue. The ultimate resolution of whether plaintiffs had an enforceable contract in respect of CY appointments must be rendered by the finder of fact.

### III

If plaintiffs can demonstrate to the satisfaction of the fact finder that defendant's conduct created an enforceable obligation, the next question is whether those individual agreements would be superseded by the collective agreement. If that is the case, plaintiffs would be precluded from recovering.

*N.J.S.A.* 34:13A–5.3 provides that representatives selected by public employees for collective negotiating purposes "shall be the exclusive representatives for collective negotiation concerning the terms and conditions of employment." Public employees who have selected a representative therefore have no separate negotiating rights. Their collective negotiations representative protects and advances their interests. The union in turn is charged with fairly representing the interests of all employees in negotiating a collective agreement and representing the employees after the parties consummate an agreement.

Three decades ago, Justice Francis, writing for a unanimous Court in *Lullo v. Int'l Assoc. of Fire Fighters,* 55 *N.J.* 409, 262 *A.*2d 681 (1970), addressed the very concerns implicated in this appeal. He observed that collective agreements are designed to "supersede the possible terms of individual agreements of employers with terms which reflect the strength and bargaining power and serve the welfare of the group." *Id.* at 428, 262 *A.*2d 681. The Court explained that the union movement "was born of the realization that a single employee had no substantial economic strength. He had little leverage beyond the sale of his own efforts to aid him in obtaining fair wages, hours of work and working conditions." *Id.* at 425, 262 *A.*2d 681 (citing *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 *U.S.* 1, 33–34, 57 *S.Ct.* 615, 622–623, 81 *L.Ed.* 893, 909 (1937)). Employees thus turned to labor unions "to

strengthen and further that community of interest" because "in union there is strength and a means of achieving an equitable balance of bargaining power." *Ibid.* The collective agreement that would result from union representation was viewed by the Court as an effective way to protect employees against exploitation. Although the negotiation rights of individuals generally would have to yield to the interests of the collective group under such agreements, employees as a whole benefit because the "terms and advantages of the collective agreement become open to every employee in the represented unit" as opposed to "advantages to an employee through an individual contract [that] 'may prove as disruptive of industrial peace as disadvantages.'" *Id.* at 428, 262 A.2d 681 (quoting *J.I. Case Co. v. Nat'l Labor Relations Bd.*, 321 U.S. 332, 338, 64 *S.Ct.* 576, 581, 88 *L.Ed.* 762, 768 (1944)).

In support of the policy favoring collective agreements over piecemeal agreements by individuals, the *Lullo* Court relied on the landmark United States Supreme Court decision of *J.I. Case Co. v. Nat'l Labor Relations Bd., supra.*[3] The *J.I. Case* Court considered the issue of whether an employer could have separate individual agreements with unionized employees despite an existing collective bargaining agreement. The union in that case was certified as the exclusive bargaining representative of the employees whose individual employment contracts still were in effect. 321 U.S. at 333, 64 *S.Ct.* at 578, 88 *L.Ed.* at 765. The employer argued that the preexisting individual contracts precluded negotiating over matters affecting rights and obligations under those individual contracts. *Id.* at 334, 64 *S.Ct.* at 578, 88 *L.Ed.* at 765. The

---

[3] In the field of public employee labor relations, the National Labor Relations Act, 29 *U.S.C.A.* §§ 157, 159(a), enacted in 1935, and federal decisional law, provide guidance in resolving collective agreement disputes. *Galloway Township Bd. of Educ. v. Galloway Township Ass'n of Educ. Secretaries*, 78 *N.J.* 1, 10, 393 A.2d 207 (1978). *See also Lullo, supra,* 55 *N.J.* at 423, 262 A.2d 681 (noting that National Labor Relations Act, where pertinent, is instructive as to interpretations of our own statute). Although we are not bound by that law, sixty-five years of judicial interpretation can be invaluable in resolving disputes in the public sector.

union then filed an unfair labor practice charge. *Ibid.* The Supreme Court concluded that employers and employees could not maintain individual agreements that waive any benefit to which the employees would be entitled under the collective agreement. Otherwise, the goal of permitting employees to use their bargaining power to secure favorable terms of employment while serving the welfare of the group would be undermined. *Id.* at 338, 64 *S.Ct.* at 580, 88 *L.Ed.* at 768. The Court noted that individual agreements typically are a way of "interfering with organization and choice of representatives" and, even if they provide for increased compensation, create the suspicion that that benefit is "being paid at the long-range expense of the group as a whole." *Id.* at 338–39, 64 *S.Ct.* at 581, 88 *L.Ed.* at 768.

The *J.I. Case* decision, however, does not impose an absolute bar on the ability of bargaining unit members to enter into individual contracts with the employer. The Court noted that it was "not called upon to say that under no circumstances can an individual enforce an agreement more advantageous than a collective agreement." *Id.* at 338, 64 *S.Ct.* at 580, 88 *L.Ed.* at 768. The Court declared that "where there is great variation in circumstances of employment or capacity of employees, it is possible for the collective bargain to prescribe only minimum rates or maximum hours or expressly to leave certain areas open to individual bargaining." *Id.* at 338, 64 *S.Ct.* at 581, 88 *L.Ed.* at 768. Moreover, the Court observed that "[i]ndividual contracts cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by appropriate forums under the laws of contracts applicable, and to the Labor Board if they constitute unfair labor practices." *Id.* at 339, 64 *S.Ct.* at 581, 88 *L.Ed.* at 768. The *J.I. Case* decision, therefore, "does not stand for the proposition that all individual employment contracts are subsumed into, or eliminated by, the collective-bargaining agreement." *Caterpillar Inc. v. Williams,* 482 *U.S.* 386, 396, 107 *S.Ct.* 2425, 2431, 96 *L.Ed.*2d 318, 329 (1987).

In *Caterpillar*, the Supreme Court relied on *J.I. Case* in holding that individual agreements are not inevitably superseded by the adoption of a collective agreement. The employees in that case, who were abruptly fired, filed suit alleging that the employer made them oral and written promises for long-term employment upon which the employees relied in staying at the company rather than seeking other employment. *Id.* at 389, 107 *S.Ct.* at 2427–28, 96 *L.Ed.*2d at 325. The employer sought to remove the case to federal court, contending that the breach of contract claims essentially were claims arising under § 301 of the Labor Management Relations Act (LMRA), 29 *U.S.C.A.* § 185. Section 301 governs claims founded on rights created by collective agreements in industries affecting commerce and thus preempts state causes of action to enforce those rights. *Id.* at 394, 107 *S.Ct.* at 2431, 96 *L.Ed.*2d at 328. The employer argued that the subsequent collective agreement extinguished the state-law individual contract claims by the employees. *Id.* at 390, 107 *S.Ct.* at 2428, 96 *L.Ed.*2d at 326.

Justice Brennan, writing for the Court, observed that the employer's basic error was "its failure to recognize that [an employee] covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Id.* at 396, 107 *S.Ct.* at 2431, 96 *L.Ed.*2d at 330. *See also Lingle v. Norge Div. of Magic Chef*, 486 *U.S.* 399, 411, 108 *S.Ct.* 1877, 1884, 100 *L.Ed.*2d 410, 422 (1988) (noting that under Section 301 analysis "judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements"). Moreover, the collective agreement may reserve certain issues to be resolved by individual agreement. *Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 *U.S.* 342, 347, 64 *S.Ct.* 582, 585, 88 *L.Ed.* 788, 791 (1944).

Similarly, New Jersey courts have applied the federal labor principle that individual contracts are void only to the extent that

they conflict with collective agreements or interfere with the principles of collective negotiation. See *New Jersey Transit Auth. v. New Jersey PBA*, 314 *N.J.Super.* 129, 139–40, 714 *A.*2d 329 (App.Div.1998) (noting that employer could include requirement in individual employment contracts that does not conflict with collective negotiations agreement); *Mossberg v. Standard Oil Co.*, 98 *N.J.Super.* 393, 403, 237 *A.*2d 508 (Law Div.1967) (stating that "individual contract is only given force and effect if it can in no way frustrate the policy of the National Labor Relations Act and does not conflict with a collective bargaining agreement"). Courts may look to the collective agreement to decide whether a conflict exists between the alleged individual agreement and the collective agreement. *Ibid.; Caterpillar, supra,* 482 *U.S.* at 398, 107 *S.Ct.* at 2433, 96 *L.Ed.*2d at 331.

■ In our view, the collective agreement in this case does not preclude the type of agreements plaintiffs allege were established. First, the individual agreements, if established, would not be inconsistent with the collective agreement. Second, the alleged individual agreements do not diminish any rights provided for under the collective agreement. Finally, the AAUP in this case has agreed to allow individual rights to be enforced by faculty members.

The primary reason why plaintiffs' individual agreements would not be superseded by the collective agreement is the absence of a conflict. If a conflict did exist, the University persuasively argues that the collective agreement should prevail over the individual agreement, because otherwise the collective agreement would be undermined and labor relations destabilized. It is true that the subject matter of this dispute, namely, whether plaintiffs are entitled to CY appointments, is covered by the collective agreement. Article XXII of the collective agreement—"CONDITIONS OF EMPLOYMENT"—defines the responsibilities of AY appointments and CY appointments. AY appointments are defined as follows: "Appointment for the academic year *requires* that the appointee be in attendance at the University from September 1 to

Commencement, or an equivalent period, within each academic year unless excused by the appropriate academic officer." (Emphasis added). Conversely, CY appointments are defined as follows: "Appointees for the calendar year (July 1–June 30) are *expected to* devote the entire year to their University duties with the exception of a vacation of one month." (Emphasis added).

The more precise question is whether a conflict exists between the individual contracts and the terms included in the collective agreement. We conclude that the collective agreement, by its own language, does not preclude the existence of individual agreements with varying terms applicable to CY appointees. CY appointees are "expected to" work year-round—they are not required to be in attendance for the calendar year, as AY appointees are "require[d]" to be in attendance for the academic year. "Expected to" obviously denotes something less than required. Given the two different standards, we believe that the parties intended a distinction between the terms applicable to CY and AY appointees, especially in light of the fact that defendant was aware that there existed unconditional CY appointees who, in the past, had successfully protested when defendant attempted to alter their appointment status. Accordingly, the definition of a CY appointee under the collective agreement embraces faculty members who, although "expected to," do not necessarily perform year-round responsibilities at the University. We conclude that the parties intended greater flexibility, perhaps even an accommodation, by imposing the lesser standard of "expected to" for CY appointees. Plaintiffs' agreements would not be inconsistent with the terms of the collective agreement and the absence of a conflict erases any concern that the collective agreement would be undermined.

Second, we find it noteworthy that the individual agreements asserted here would not diminish plaintiffs' collective rights. Although the *J.I. Case* decision clearly precludes an individual agreement that would take away collective rights, that decision does not preclude an individual agreement that is more advantageous than a collective agreement, so long as it does not conflict

with the goals of collective bargaining in general. That is precisely the case here.

Finally, the acquiescence of the AAUP in allowing faculty to pursue individual rights under the collective agreement supports our conclusion. The rationale for the general rule that collective agreements prevail over individual agreements is that the latter tend to undermine both the collective agreement and the collective negotiations representative, the union, which is charged with enforcing the collective agreement. This case is different, however, because (1) the AAUP agreed, as we will discuss in more detail below, that Category Two grievances may be enforced by either the Union or the faculty member and that either may do so by way of litigation rather than arbitration; and (2) the record demonstrates that the AAUP actively assisted faculty members in instances when defendant sought to eliminate the unconditional CY status of professors. Accordingly, we conclude that the collective negotiations representative here has agreed, by its contract and by its conduct, that individual rights may be enforced by individual plaintiffs. When a union specifically agrees that disputes arising apart from the collective agreement may be enforced, it voluntarily surrenders a degree of its hegemony. In such cases, the traditional concerns of piecemeal agreements interfering with collective agreements are substantially reduced, if not eliminated.

Our holding undermines neither the fundamental importance nor the function of collective agreements. Indeed, we reinforce the rule of *Lullo:* generally, collective agreements prevail over individual agreements and, when there is a conflict, the individual agreements may not be enforced. Nevertheless, we follow established principles of State and federal labor law in allowing an employee to bring an individual contract claim in the unique circumstances of this case. First, the individual agreements, if proven, do not conflict with the collective agreement itself or the benefits of collective negotiation in general. *Caterpillar, supra,* 482 *U.S.* at 396, 107 *S.Ct.* at 2431, 96 *L.Ed.*2d at 329 ("[I]ndividual

employment contracts are not inevitably superseded by any subsequent collective-bargaining agreement."). A contrary result would permit an employer to make individual, independent promises to employees that are not precluded by the collective agreement, and then raise the collective agreement as a defense when the employee seeks to have those promises fulfilled. Further, the alleged agreements would not diminish rights provided by the collective agreement. Finally, this case presents the unusual circumstance in which the Union, by language in the collective agreement, and by its assistance with regard to faculty grievances, specifically approves and condones the pursuit of individual rights. If the Union concludes, as it apparently has here, that the enforcement of individual rights is not in derogation of its status as collective negotiations representative, we will not interfere with that judgment. In our view, long-standing principles favoring collective agreements and forbidding unfair labor practices are not subverted in this case.

## IV

We address next whether a court of law is the proper forum for this dispute.

Our Legislature requires that collective agreements in the public sector include provisions for grievance procedures through which the employees may appeal "the interpretation, application or violation of policies, agreements, and administrative decisions ... affecting them." *N.J.S.A.* 34:13A–5.3. The grievance procedures established under the collective agreement "shall be utilized for any dispute covered by the terms of such agreement." *Ibid. See also New Jersey Tpk. Employees' Union v. New Jersey Tpk. Auth.,* 123 *N.J.Super.* 461, 467, 303 *A.2d* 599 (App.Div.1973), (upholding exclusivity of grievance procedure for disputes brought by public employees), *aff'd,* 64 *N.J.* 579, 319 *A.2d* 224 (1974). The Employer–Employee Relations Act "permits the parties to include dispute resolution mechanisms, including arbitration, in the negotiated agreement." *Saginario v. Attorney General,* 87 *N.J.* 480, 490, 435 *A.2d* 1134 (1981). Nevertheless, the

question whether a particular dispute is arbitrable under the terms of the parties' contract is an issue to be decided by the courts. *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 153–54, 393 *A.*2d 278 (1978).

Before we determine whether this dispute is arbitrable or justiciable, we review the complex grievance procedure established under the collective agreement. The grievance begins at Step One, in which University personnel conduct their own investigation resulting in a written response to the grievants. After Step One, the AAUP or the grievant has under normal circumstances thirty working days from the receipt of the Step One decision to appeal the grievance to Step Two, which is arbitration. If the grievance is a Category One grievance, it proceeds to binding arbitration; Category Two grievances are resolved through advisory arbitration.

In October 1992, the AAUP sought Step Two arbitration after the University's Assistant Vice President for Faculty Affairs denied the grievance at Step One. The threshold question the arbitrator faced was whether the dispute was a Category One grievance, to be resolved through binding arbitration, or a Category Two grievance, to be resolved through advisory arbitration. The arbitrator concluded that plaintiffs' grievance was a Category Two grievance and the parties do not dispute that determination.

Article IX, Section E(6)(b) of the collective agreement provides that Category Two grievances are to be resolved by Step Two advisory arbitration. Section F(4) of that Article provides that "[w]hether or not pursued, this [Step Two] procedure shall constitute the sole and exclusive right and remedy of bargaining-unit members and the AAUP for any and all claims cognizable under this procedure."

Despite that seemingly unequivocal language, the very next subsection, F(5), describes what should happen to a Step Two grievance when the grievant or the AAUP brings action in court involving the grievance:

5. Step Two [arbitration] of this grievance procedure shall be held in abeyance for any portion of a grievance *while any court or agency proceeding, brought by the*

*AAUP or the grievant and concerning the substance of that portion of the grievance, is pending.* In the event that a court or agency makes a binding determination on the substance of that portion of the grievance, Step Two of this grievance procedure shall no longer be available for that portion of the grievance. Nothing in this provision shall be construed or implied as a waiver by the University of the defenses of exhaustion of remedies or exclusivity of the grievance procedure, except as provided in paragraph 6. below.

[ (Emphasis added).]

Further, Article IX, Section F(6) of the collective agreement sets forth the circumstances under which defendant is precluded from asserting an exhaustion of remedies defense or exclusivity of the grievance defense:

6. Exception as to Category Two Grievances. If the AAUP does not timely invoke Step Two [arbitration] ... *and the AAUP and/or the grievant(s) commence a court proceeding* pertaining to the grievance within 45 working days of the last date upon which the AAUP could have timely invoked Step Two, the defenses of exhaustion of remedies or exclusivity of the grievance procedure will *not be available* to the University in such court proceeding....

[ (Emphasis added).]

Defendant argues that Article IX, Section F(6) should be interpreted to allow professors to initiate a court action concerning Category Two grievances only after two conditions are met: (1) the Union does not timely invoke "Step Two" arbitration; and (2) the AAUP and/or grievants commence a court proceeding pertaining to the grievance within forty-five days of the last date on which the AAUP could have timely invoked Step Two.

We reject that interpretation of the collective agreement. Section F(5) preserves the right of defendant to raise the defenses of exhaustion of remedies or exclusivity of the grievance procedure. Section F(6) merely provides for two exceptions in which those defenses cannot be raised: if the AAUP does not timely invoke arbitration and when a court proceeding is commenced forty-five days after the right to arbitrate under Step Two has elapsed. F(6) is a procedural clause that precludes defendant from even raising certain defenses—it cannot be read to establish conditions that plaintiffs must meet prior to commencing a court action.

Rather, Article IX, Section F(5) and F(6), when read together, demonstrate that the parties contemplated and established litiga-

tion as an alternative to Step Two arbitration. Why would the parties have included a clause under F(5) providing for the abeyance of Step Two arbitration "while any court or agency proceeding ... is pending" if, as defendant suggests, plaintiffs could commence litigation only after the right to Step Two arbitration has expired? If plaintiffs were permitted to initiate court action only after missing the deadline for bringing Step Two arbitration, as defendant would interpret the collective agreement, there would be no purpose for including the provision under F(5) that stays arbitration when litigation has commenced. We should honor the intent of both parties who acknowledged in the collective agreement, albeit implicitly, that individual rights can be litigated. *Grover v. Universal Underwriters Ins. Co.*, 80 *N.J.* 221, 229, 403 *A.*2d 448 (1979) ("[O]nly those issues may be arbitrated which the parties have agreed [to arbitrate].").

In passing, we note that even if we accept defendant's interpretation of F(6), we conclude alternatively that plaintiffs would have met defendant's conditions. First, it cannot be said that plaintiffs truly "invoked" Step Two arbitration on the merits of the dispute because an arbitrator merely determined that the dispute was non-arbitrable as a Category One grievance. To invoke the remedy of arbitration, in our view, means an exercise of the right to pursue that remedy. Here, once plaintiffs were faced with a determination that their grievance would have to proceed under advisory arbitration, they elected not to invoke that remedy and, instead, chose to pursue their federal claim. Second, there can be no dispute that plaintiffs acted timely within the forty-five day deadline under the collective agreement. Although the collective agreement may have contemplated that litigation be barred because it is filed too late, the claim here cannot be extinguished because it was filed too early.

## V

The Appellate Division held that decisions to "hire, retain, promote, assign and transfer" professors are matters of manageri-

al prerogative, that this was such a dispute and, although those matters may be submitted to advisory arbitration, litigation of such disputes is impermissible. We hold that this dispute, involving as it does an issue over whether plaintiffs are required to work for the calendar year as CY appointees, is not a matter of managerial prerogative. It is a dispute over a faculty work schedule, a term and condition of employment, that may be litigated.

 Questions concerning whether subjects are mandatorily negotiable should be made on a case-by-case basis. *Jersey City v. Jersey City Police Benevolent Assoc.*, 154 *N.J.* 555, 574, 713 *A.*2d 472 (1998). In *Burlington County College Faculty Association v. Board of Trustees*, 64 *N.J.* 10, 311 *A.*2d 733 (1973), Burlington County College established a college calendar each year that fixed the length and division of the college year, that is, when the College would be open. *Id.* at 12, 311 *A.*2d 733. When the faculty union sought to negotiate the length of the calendar, the College declined. *Id.* at 13, 311 *A.*2d 733. This Court concluded that the college calendar is not a proper subject of mandatory negotiation because the Board was statutorily responsible for the "management and control" of the college and was under no legal mandate to negotiate in matters that only had a "practical effect" on the faculty's employment arrangements. *Id.* at 13–14, 311 *A.*2d 733. However, the Court noted that the calendar does not establish the days and hours of work by individual faculty members or their compensation, matters that are "mandatorily negotiable under the Act." *Id.* at 12, 311 *A.*2d 733.

*Piscataway Board of Education v. Piscataway Tp. Principals Ass'n*, 164 *N.J.Super.* 98, 395 *A.*2d 880 (App.Div.1978), provides further guidance in deciding whether a matter is a non-negotiable exercise of managerial prerogative. The Board of Education in that case unilaterally reduced the yearly term of employment of teachers from twelve months to ten months, resulting in a proportionate reduction in salary for those teachers. *Id.* at 100, 395 *A.*2d 880. The faculty association filed an unfair practice charge with

the Public Employment Relations Commission (PERC). *Ibid.* PERC rejected the Board's argument that the subject matter was not a mandatory subject of negotiations and instead concluded that the Board committed an unfair practice. *Ibid.* The Appellate Division affirmed, observing that "[w]e have no doubt that the matter of length of the work year and its inseparable concomitant—compensation—are terms and conditions of employment . . . and consequently the subject of mandatory negotiation before being put into effect by the public employer." *Ibid.*

In the matter before us, we believe that the change of the plaintiffs' status from CY appointees to AY appointees, with a proportionate pay cut, involved a decision concerning "terms and conditions of employment" under the Employer–Employee Relations Act, *N.J.S.A.* 34:13A–5.3. Although the establishment of a school calendar is a managerial prerogative, a decision that directly impacts the days worked and compensation for those days implicates a term and condition of employment. Similarly, this case involves the number of days a CY appointee must work and is a mandatorily-negotiable term of employment. In an appropriate case in which an agreement is reached, a dispute over such a term and condition of employment can be submitted to binding arbitration. The grievance here, however, cannot be submitted to binding arbitration because it is a Category Two grievance. It can be litigated under Article IX, Section F, subsections 5 and 6, of the collective agreement.

## VI

We hold that there is a fact question in this case regarding whether defendant created an enforceable obligation that prevented plaintiffs' alleged status as unconditional calendar-year appointees from being altered. We reinforce the principle that collective agreements generally prevail over individual agreements. *Lullo, supra,* 55 *N.J.* at 428, 262 *A.*2d 681. Nevertheless, if plaintiffs can demonstrate to the satisfaction of the fact finder that defendant's conduct created an enforceable obligation, we

hold that the collective agreement would not supersede those individual agreements in the unusual circumstances of this case and that the collective agreement permits this dispute to be litigated. Finally, the Appellate Division erred in characterizing this dispute as one involving managerial prerogative—this case directly impacts the number of days plaintiffs must work and their commensurate compensation and thus is a mandatorily—negotiable term and condition of employment that may be litigated under the collective agreement.

Reversed and remanded.

VERNIERO, J., concurring.

I join in the Court's thoughtful and comprehensive opinion. I write separately to emphasize that although the Court discusses the contours of *Woolley v. Hoffmann–La Roche, Inc.*, 99 *N.J.* 284, 491 *A.*2d 1257, *modified on other grounds*, 101 *N.J.* 10, 499 *A.*2d 515 (1985), it does so only in the course of concluding that the doctrine of *Woolley* does not apply. Indeed, this Court has never directly extended the requirements of *Woolley* to public employers, and recently declined an invitation to so do. *See Golden v. County of Union*, 163 *N.J.* 420, 431, 749 *A.*2d 842 (2000) (concluding that public employee's reliance on *Woolley* was misplaced in view of statutory language establishing employee's at-will employment status). *See also Walsh v. State*, 147 *N.J.* 595, 689 *A.*2d 131 (1997) (affirming determination that implied-contract doctrine should not apply to public employee's action in view of at-will relationship created by statute).

Moreover, in a case involving a county adjuster whose appointment was governed by statute, we did not imply a fixed term of employment or impose one on the public employer. *DiPaolo v. Passaic County Bd. of Chosen Freeholders*, 322 *N.J.Super.* 487, 493, 731 *A.*2d 519 (App.Div.1999) (holding that "the public employment relationship derives from applicable statutory schemes and not from an independent contract between public employer and employee"), *aff'd o.b.*, 162 *N.J.* 572, 745 *A.*2d 540 (2000).

Nor do I consider that the Court's reliance on *Shebar v. Sanyo Business Systems Corp.*, 111 *N.J.* 276, 544 *A.*2d 377 (1988), suggests that implied contracts may now be routinely recognized between public employers and employees. *Shebar* is cited merely as an example of a case in which the Court, applying traditional principles of contract formation, concluded that material issues of fact precluded summary judgment. Such is the case here.

Granting them all favorable inferences due under *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), plaintiffs are entitled to have a jury determine whether the parties had formed individual calendar-year contracts. In making that determination, jurors should rely not on *Woolley* or its doctrine of implied contracts, but on the more traditional tenets of contract law used in this setting. I also consider the Court's holding to be limited by the idiosyncratic facts of this case. In my view, then, the Court's holding would not extend to any case resembling *Golden, DiPaolo,* or *Walsh,* in which the employment relationship derives from a clear statutory scheme.

For those reasons, I join in the Court's disposition and consider it to be the correct one.

Justices COLEMAN and LaVECCHIA join in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.