714 A.2d 329

NEW JERSEY TRANSIT AUTHORITY, APPELLANT, v. NEW JERSEY TRANSIT PBA, LOCAL 304, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued June 2, 1998—Decided July 16, 1998.

Before Judges LONG, STERN and KIMMELMAN.

*David S. Griffiths,* Deputy Attorney General, argued the cause for appellant (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Griffiths,* on the brief).

*Stephen B. Hunter* argued the cause for respondent New Jersey Transit PBA, Local 304 (*Klausner & Hunter,* attorneys; *Mr. Hunter* of counsel and on the brief; *David L. Rosenberg,* on the brief).

*Robert E. Anderson,* General Counsel, argued the cause on behalf of the Public Employment Relations Commission.

The opinion of the court was delivered by

LONG, P.J.A.D.

On January 23, 1995, New Jersey Transit PBA, Local 304 filed an unfair practice charge against New Jersey Transit alleging that it violated its duty to negotiate over terms and conditions of employment under the Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 *et seq.* The charge specified that the employer did not negotiate before it imposed as a term and condition of employment the requirement that police recruits agree to repay training costs if they leave employment within two years. A complaint issued pursuant to *N.J.A.C.* 19:14–2.1. The parties stipulated the facts, waived a hearing, and submitted briefs. Both parties sought summary judgment.

The following is the stipulation:

1. New Jersey Transit PBA Local 304 is the recognized majority representative for all non-supervisory Transit Police employed by New Jersey Transit.

2. New Jersey Transit is a public employer within the meaning of the New Jersey Employer–Employee Relations Act and is subject to the Act's provisions.

3. The New Jersey Transit PBA Local 304 (hereinafter the "PBA") and New Jersey Transit (hereinafter "Transit") are the parties to a collective negotiations agreement that expired as of June 30, 1992.

4. The parties have recently concluded negotiations with regard to a successor collective bargaining agreement covering the period between July 1, 1992 and June 30, 1996. A copy of that agreement is annexed as Exhibit "A".

5. Prior to August 11, 1994, police trainees employed by New Jersey Transit who were required to attend the Middlesex County Police Training Academy for training as a Police Officer had all of their Academy training costs paid by Transit during the pertinent time period. There were no restrictions placed on the ability of these trainees to leave the employ of Transit at any time and be free from any obligation to indemnify Transit for the Academy training costs at issue. After August 11, 1994, Transit has paid for the training costs also, subject to the disputed repayment obligation set forth in Exhibit "B," referred to in Paragraph 7, *infra*.[1]

6. On or about August 11, 1994 all new applicants for employment as police officers were required to sign an agreement (Exhibit "B") which obligated those applicants to agree to repay Transit for portions of the Academy training costs at issue if those Officers left the employ of Transit at any time within two years of the completion of their Academy training. The requirement to sign such agreement pertained to all applicants who were offered employment; signing the agreement was a condition of initial employment.

7. The affected Officers were required to sign the attached agreement (Exhibit "B") as a condition for their continued employment by Transit, for those accepting initial employment [as] set forth in Paragraph 6, *supra*.

8. At no time did any agent or representative of Transit attempt to negotiate the issue dealing with training costs reimbursements with the PBA as the majority representative of the affected Officers.

9. According to Transit, the cost to Transit to train a probationary police officer at the police academy for 22 weeks includes approximately $1,200.00 for the academy and equipment, uniforms, etc., and approximately $20,000.00 in salary and benefit costs for that period.

---

1 The New Jersey Transit Offer of Employment contains the following language:

As a condition of receiving police academy training through NJ TRANSIT, you will be required to commit to repaying NJ TRANSIT in the event you voluntarily leave the company within 2 years of completing the police academy. If you leave within one (1) year of academy completion, you will be required to refund NJ TRANSIT 100% of the academy costs. If you leave within two years, but after one year you will be required to refund 50% of the academy costs to NJ TRANSIT.

IF THIS EMPLOYMENT OFFER IS ACCEPTABLE, PLEASE SIGN THE ENCLOSED COPY AND RETURN IT TO THIS OFFICE NO LATER THAN

---

I accept the offer of employment and understand the Police Academy repayment condition.

---

Signed:

---

Date:

10. For the recruits who so attend the academy (not every new hiree goes through academy training), approximately 14 weeks in service training is given before the recruit can actually begin to function as an independent officer. According to Transit, this involves an additional $13,000.00 in salary and benefits costs, for a total of approximately $33,000.00 in costs for recruits so trained.

11. The parties agree that the stipulated facts constitute the complete record.

The charging party acknowledges that to the extent the stipulated facts are insufficient to sustain its burden of proof by a preponderance of the evidence, the Complaint may be dismissed. Similarly, the respondent acknowledges that it too must rely on the sufficiency of the stipulated record to sustain any affirmative defenses it has asserted, or to rebut or disprove the *prima facie* case established by the charging party.

The New Jersey Public Employment Relations Commission (Commission) granted summary judgment to Local 304 reasoning that compensation issues and training costs are mandatorily negotiable; that being required to repay training costs upon leaving employment is a term and condition of employment affecting the employees' compensation and duration of employment; and that the repayment requirement is negotiable despite the fact that employees do not have to repay until after leaving employment. The Commission ordered New Jersey Transit to stop refusing to negotiate over the repayment condition, return monies collected, and post a notice concerning the violation and remedy.

New Jersey Transit appeals, acknowledging "the apparent facial applicability" of the conventional negotiability analysis, but arguing that the repayment agreement at issue is, by its very nature, distinct from ordinarily negotiable subjects because (1) the union has no practical role to play in its administration; (2) the promise is elicited prior to employment and is thus a non-negotiable employment qualification; (3) the promise is only redeemable after the employment ends; and (4) the public interest favors the imposition of such a repayment obligation. We have carefully reviewed this record in light of these contentions and have concluded that our intervention is unwarranted and that an affirmance is in order.

The parties do not dispute the relevant legal principles or the scope of review. All agree that the Commission has broad

authority in the field of employer-employee relations in the public sector and that judicial review is circumscribed. *Matter of Hunterdon Cty. Freeholders Bd. and CWA*, 116 *N.J.* 322, 328–29, 561 *A.2d* 597 (1989). The matter is simply one as to the reasonableness of a decision by a statutory administrative agency in the area of its duly delegated authority. The role of judicial review in that regard is thoroughly settled. "The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious." *Id.* This standard applies in cases turning on negotiability issues. *Id.* at 328–29, 561 *A.2d* 597; *Edison Tp. Bd. of Ed. v. Edison Tp. Principals and Supervisors Ass'n*, 304 *N.J.Super.* 459, 701 *A.2d* 459 (App.Div.1997).

As to the requirement of negotiability, *N.J.S.A.* 34:13A–5.3 provides that:

> Proposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established.

By this statute, the Legislature prescribed that the terms and conditions of employment may not be established unilaterally but only by negotiations and, if possible, agreement as the way to improve morale and efficiency of public employees. *Woodstown–Pilesgrove Reg. Sch. Dist. Bd. of Ed. v. Woodstown–Pilesgove Reg. Ed. Ass'n*, 81 *N.J.* 582, 591, 410 *A.2d* 1131 (1980); *Galloway Tp. Bd. of Ed. v. Galloway Tp. Ed. Ass'n*, 78 *N.J.* 25, 48, 393 *A.2d* 218 (1978).

Section 5.4a(5) of the Act prohibits public employers from "[r]efusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment...." *N.J.S.A.* 34:13A–5.4a(5). It is thus an unfair labor practice under the Act for management to alter a mandatorily negotiable term or condition of employment without first providing an opportunity for the exclusive bargaining representative of the affected employees to negotiate with the employer over that change. *See Galloway Tp. Bd. of Ed. v. Galloway Tp. Ass'n of Ed. Sec.*, 78 *N.J.* 1, 393 *A.2d* 207 (1978).

*Local 195, IFPTE v. State,* 88 *N.J.* 393, 443 *A.*2d 187 (1982), summarizes the tests for determining whether a subject is negotiable under section 5.3:

> The central issue in a scope of negotiations determination is whether or not a particular subject matter is negotiable. This depends on careful consideration of the legitimate interests of the public employer and the public employees. The process of balancing those competing interests is constrained by the policy goals underlying relevant statutes and by the Constitution.
>
> \*     \*     \*
>
> �damaged [A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer.
>
> When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.
>
> [88 *N.J.* at 401–05, 443 *A.*2d 187].

We agree with PERC that the disputed repayment agreement is literally a term or condition of employment insofar as it specifies how long employees must work in order to avoid having to repay training costs and how much of the salary they have earned will be subject to disgorgement if they choose to leave their jobs earlier. This condition restricts an employee's freedom to leave employment and reenter the labor market and effectively reduces the amount of compensation he or she has received. As such, it intimately and directly affects the work of New Jersey Transit employees. Further, it has not been preempted by statute or regulation, thus meeting the second prong of *Local 195.*

The only possible basis on which to insulate it from negotiation is its connection to the exercise of a managerial prerogative. In this respect, New Jersey Transit argues that because the repayment agreement effectuates a significant government policy—hiring applicants who are willing to commit to remaining in government service for at least two years—it is non-negotiable.

This argument omits consideration of the well-established principle that

> the finding of a connection between a managerial prerogative and an issue sought to be negotiated does not automatically bar negotiability. Indeed, nearly every determination by management in the public sector will, in some measure, implicate the governmental policy making function. It is for this reason that in *Local 195* the Supreme Court required the showing of a "significant" interference with managerial prerogative in order to preclude negotiation.
>
> [*City of Elizabeth v. Elizabeth Fire Off.*, 198 *N.J.Super.* 382, 386, 487 *A.2d* 337 (App.Div.1985).]

In *City of Elizabeth*, we recognized that while the city had a managerial prerogative to require sick leave verification at any time, the question as to who would pay for such doctors' reports was severable and subject to negotiation. We stated:

> We think that the commission struck the proper balance in this case. By holding that the city had a managerial prerogative to require sick leave verification at any time, the commission protected the governing body's interest in identifying and dealing with sick leave abuse. By severing the question of who pays for the required doctors' reports, the commission protected the legitimate economic interests of employees in avoiding unnecessary financial obligations and in negotiating a full package of health care benefits. Together, these holdings accommodate the legitimate interests of management and labor without unduly interfering with managerial prerogative.
>
>       *      *      *
>
> We view the situation in this case as falling rather clearly within the reasoning expressed in *Woodstown–Pilesgrove*. The kinds of facts justifying a bar against negotiability as established in *Local 195* simply are not present here. Since we find no significant interference with the determination of governmental policy, there is no reason for us to interfere with a decision of the commission which we view as entirely correct.
>
> [*Id.* at 386–388, 487 *A.2d* 337].

This reasoning is equally applicable here. To be sure, a public employer has a prerogative to determine training issues. *See, e.g., Borough of Avalon,* P.E.R.C. No. 93–105, 19 *NJPER* 270 (¶ 24135 1993); *Orange Tp.,* P.E.R.C. No. 90–119, 16 *NJPER* 392 (¶ 21162 1990); *Mine Hill Tp.,* P.E.R.C. No. 87–93, 13, 15 *NJPER* 513 (¶ 20213 1989). *Cf. City of Elizabeth, supra,* 198 *N.J.Super.* 382, 487 *A.2d* 337.

■ However, it is well-established that employees may negotiate the costs connected with training without significantly impinging on the managerial prerogative. *Burlington Cty. College,* P.E.R.C. No. 90–13, 15 *NJPER* 513 (¶ 20213 1989). *Cf. City of Elizabeth, supra,* 198 *N.J.Super.* 382, 487 *A.2d* 337. For example, PERC has consistently held, without legislative interference, that employees may negotiate over whether they will be compensated during training, how much compensation they will receive, and whether their compensation will be effectively reduced by having training costs imposed on them. *See, e.g., Avalon; Mine Hill Tp.; Franklin Tp.,* P.E.R.C. No. 86–83, 12 *NJPER* 98 (¶ 17037 1985); *City of Newark,* P.E.R.C. No. 80–52, 11 *NJPER* 703 (¶ 16242 1985); *Franklin Tp.,* P.E.R.C. No. 85–97, 11 *NJPER* 224 (¶ 16087 1985). *See also Hunterdon* at 332. *Dunellen,* P.E.R.C. No. 95–113, 21 *NJPER* 249 (¶ 26159 1995); *Town of Hackettstown,* P.E.R.C. No. 82–102, 8 *NJPER* 308 (¶ 13136 1992); *Burlington Cty. College,* P.E.R.C. No. 90–13, 15 *NJPER* 513 (¶ 20213 1989). *See, e.g., Middlesex Cty Bd. of Social Services,* P.E.R.C. No. 92–93, 18 *NJPER* 137 (¶ 23065 1992); *Hackettstown.* The repayment agreement here falls squarely within the reasoning of these cases. Indeed, as a method of employee retention, it is no different from an affirmative inducement to remain employed such as an automatic salary increase or a vacation enhancement for two years service. Like such inducements, the repayment agreement is subject to negotiation. *City of Elizabeth.*

■ New Jersey Transit also argues that the repayment obligation does not arise until the employee has left his or her employment thus eliminating it as a term or condition of employment. PERC rejected this argument, as do we. The technical status of "non-employee" when the agreement to repay is triggered is irrelevant to the practical effects a cost-shifting requirement has on the employees' freedom to leave their jobs and their ability to retain the compensation they have received. *Compare State of New Jersey (Dept. of Higher Ed.),* P.E.R.C. No. 96–47, 22 *NJPER* 37 (¶ 27018 1995) (majority representative could arbitrate

grievance seeking compensation for unused vacation days although affected person is no longer an "employee"); *Atlantic Cty.,* P.E.R.C. No. 95–66, 21 *NJPER* 127 (¶ 26079 1995) (current employees may negotiate for health benefits to be received after they retire).

■ Nor are we persuaded by New Jersey Transit's argument, made for the first time on appeal, that because the agreement to repay training costs is entered into *before* a recruit becomes an "employee," it should be viewed as an employment qualification. The repayment requirement does not bear on the skills and competencies needed to do the job. Those are the qualifications reserved to management. *Teaneck Bd. of Education v. Teaneck Teacher's Ass'n,* 94 *N.J.* 9, 462 *A.*2d 137 (1983). Indeed, the Act's protections would be negated by allowing employment terms and conditions to be dictated unilaterally in pre-hire agreements simply because job applicants who have been offered employment are technically not yet "employees." *Compare Belleville Ed. Ass'n v. Belleville Bd. of Ed.,* 209 *N.J.Super.* 93, 506 *A.*2d 1276 (App.Div. 1986) (salary guide placement for new hires is a subject for collective negotiations, not individual employment contracts). *See also Lullo v. IAFF,* 55 *N.J.* 409, 262 *A.*2d 681 (1970); *City of Mt. Vernon,* 18 *NYPERB* 3020 (1985). In any event, P.E.R.C reasonably determined that this dispute focuses not on the pre-employment or post-employment status of employees, but on the union's valid representational interest in the mandatorily negotiable subjects of the duration of employment and compensation.

■ New Jersey Transit finally argues that "the most important consideration" in this case is that the obligation to repay is an entirely unenforceable promise "as a practical and legal matter." It reasons that "once the employee leaves employment, the employer loses any capacity that it previously had, through the established mechanisms derived from and bound up with the labor agreement to extract performance of the promise from the individual employee." This is simply incorrect. Given a negotiated right, the employer could include a repayment requirement in its

individual employment contracts and sue to enforce those contracts. *Compare Lullo, supra,* 55 *N.J.* at 428, 262 *A.*2d 681 (collective negotiations agreement takes precedence over *conflicting* employment conditions in individual contracts). *See also J.I. Case Co. v. NLRB,* 321 *U.S.* 332, 64 *S.Ct.* 576, 88 *L.Ed.* 762 (1944). Moreover, even in the absence of a repayment provision in individual employment contracts, the employer would presumably have the same right to sue a former employee to recover monies owed to it under a collective negotiations agreement as the former employee would have to sue the employer for compensation owed by the employer under the agreement.

We note that every other jurisdiction which has considered this issue has reached the same conclusion as PERC. *City of Hallandale,* 15 *FPER* ¶ 20214 (1989); *City of Mt. Vernon,* 18 *NYPERB* 3020 (1985); *Franklin Police Dep't. v. City of Franklin, NHPELRB,* S–01313:10 (1984). So do we.

Affirmed.