**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5206-15T1

BOROUGH OF MADISON,

    Plaintiff-Appellant,

v.

KEVIN MARHEFKA,

    Defendant-Respondent.

_____

November 28, 2017 — Decided June 21, 2018

Before Judges Carroll and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Special Civil Part, Morris
County, Docket No. DC-1525-16.

Michael A. Augello, Jr., argued the cause for
appellant (Cleary Giacobbe Alfieri Jacobs,
LLC, attorneys; Matthew J. Giacobbe and
Micahel A. Augello, Jr., of counsel and on the
briefs).

Patrick B. Kiernan argued the cause for
respondent (Kiernan & Strenk, attorneys;
Patrick B. Kiernan and Charles A. Strenk, on
the brief).

PER CURIAM

Plaintiff Borough of Madison (Borough) appeals the trial court's June 20, 2016 order granting summary judgment in favor of defendant Kevin Marhefka, a former Borough police officer. We affirm.

I.

The following facts are admitted in the parties' statements of material facts, or are set forth in the documents presented on the summary judgment proceedings.

The Borough had a collective bargaining agreement (CBA) with the Madison Policemen's Benevolent Association Local 92 (PBA), commencing on January 1, 2014, and continuing through December 31, 2017. The CBA recognized the PBA "as the sole and exclusive representative for the purposes of collective negotiations concerning rates of pay, hours of employment and other conditions of employment for all full-time patrolmen in the Borough." The CBA specified the wages and benefits for such officers. The CBA did not provide either for any incentive if an officer remained on the police force, or for any penalties if an officer left the police force. The CBA was signed by the Borough's mayor, by Raymond M. Codey, the Borough Administrator, by PBA president Luis Goncalves, and by the PBA vice-president.

In December 2014, defendant applied for a position as a uniformed police officer in the Borough. Administrator Codey

2                                                    A-5206-15T1

signed a letter dated February 2, 2015 addressed to defendant.

The February 2 letter stated:

> I am pleased to inform you that the Mayor and Council of the Borough of Madison will be approving your employment with the Borough of Madison's Police Department on February 9, 2015 at its scheduled meeting. You will be paid an (annual salary/hourly rate) of $40,804.00 and will be afforded all other benefits set forth in any applicable Collective Negotiations Agreement and Employee Handbook.
>
> In accordance with Borough of Madison's practices, you will serve a one (1) year probationary term, that can be extended an additional year at the discretion of Police Chief Darren Dachisen, during which time you can be terminated with or without cause, and such termination is not challengeable through the grievance process and/or otherwise appealable in any manner. <u>If you decide to leave your position with the Borough of Madison Police Department to accept another law enforcement position</u> outside of the Borough of Madison <u>you will be assessed the following penalties in accordance with relevant years of service: (1) $5,000 for the first year; (2) $4,000 for the second year; (3) $3,000 for the third year; (4) $2,000 for the fourth year; and (5) $1,000 for the fifth year</u>. No penalty will be assessed against you if you decide to leave your position at the conclusion of your fifth anniversary of employment with the Borough of Madison Police Department. <u>Upon completing your fifth year of service you will receive a $5,000 retention stipend</u>. The stipend will not be part of your base pay.
>
> Please counter-sign this letter in the space provided below if you accept these terms and return to me no later than February 6, 2015,

and I will present the letter to the Governing Body for action at the scheduled meeting.

Congratulations.  We look forward to working with you.

[(emphasis added)].

Defendant signed the letter underneath the words "Acknowledged and Accepted."  Identical letters dated February 2, 2015, were sent to four other officer candidates, and were signed "Acknowledged and Accepted" by them.  All five letters were also signed by Codey.  The Borough's Police Chief Darren P. Dachisen, Sr. and the Borough Attorney were copied on all five letters.[1]

Also, on February 2, 2015, Chief Dachisen sent an email to all Police Department personnel stating:

> With the reduction of our starting salary and the added steps, I have voiced my concern to the governing body about retention of newly appointed officers.  We have discussed this on many occasions and have come up with a plan that I think is a good solution at the present time.  The five new officers will be presented with a five year contract prior to the appointment.  If they sign it, they are agreeing to pay the [Borough] $5,000.00 if they leave the first year, $4,000.00 the second year, $3,000 the third year and so on. In the fifth year the [Borough] will write a check to the officers and give them a $5,000.00 stipend which will not be a part of the base salary.  This will give the new officers a nice bonus in the fifth year and get them through the first several step

---

[1] Three more such letters were sent to other officers in January and March 2016, and were signed "Acknowledged and Accepted" by them.

increases.  The reason I am telling everyone this is to replace fiction with facts.  I have been in contact with both union presidents (PBA/SOA) who are also on board.

On or about February 4, 2015, PBA president Goncalves and Sean Plumstead, President of the Madison Superior Officers Association (SOA), signed and sent a document addressed to Administrator Codey.[2]  The February 4 document stated:

> The Madison PBA/SOA supports the payment of $5,000.00 as a retention stipend.  This payment will be provided to each officer being considered for appointment on February 9, 2015.  We understand that the payment will be directly to them upon reaching their 5th year employment anniversary.  We also understand that this will not be a part of their base pay.
>
> This is a contract is [sic] between the Borough of Madison and the five new officers hired February 9th, 2015.  It is understood that the acceptance of this payment will have no effect on future negotiations and will not be held against the collective bargaining unit as an award to the PBA/SOA.
>
> We respectfully request your acknowledgment that this $5,000 payment to each new officer hired on February 9th, 2015 will have no [e]ffect on the PBA/SOA for future negotiations.

Codey signed his name on the document under this statement.

On February 9, 2015, the Borough passed a resolution, signed by the mayor, appointing defendant to the position of police

---

[2] The document is dated "February 4, 2014," but the parties agree it should be dated February 4, 2015.

officer. The resolution stated that defendant would "be compensated in accordance with the [PBA] Collective Bargaining Agreement." The resolution made no mention of the February 2 letter or February 4 agreement.

Defendant became a member of the PBA. He served as an officer for the Borough without incident. However, he was offered a position as a police officer by the Township of Boonton where he resides. He accepted the Boonton position and voluntarily resigned his position on December 11, 2015. At his December 14, 2015 exit interview, Codey referenced the February 2, 2015 contract.

On December 19, 2015, defendant sent Chief Dachisen a Notice of Resignation effective December 30, 2015. In a letter dated January 20, 2016, Dachisen quoted the February 2 letter and informed defendant that according to "the terms and conditions of your employment with" the Borough, "you are contractually obliged to reimburse the Borough . . . $5,000.00 for resigning and accepting another law enforcement position outside of the Borough during the first year of your probationary appointment."

On February 16, 2016, the Borough filed a complaint against defendant seeking to recover the $5,000. After defendant filed an answer, he filed a motion for summary judgment. Plaintiff cross-moved for summary judgment. On June 20, 2016, the trial court heard oral argument on the motions, granted summary judgment

6

in favor of defendant, and dismissed plaintiff's complaint with prejudice. Plaintiff appeals.

## II.

A trial court must grant a summary judgment motion if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid.

The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). "[T]he court must accept as true all the evidence which supports the position of the party defending against the motion and must accord [that party] the benefit of all legitimate inferences which can be deduced therefrom[.]" Id. at 535 (citation omitted).

A-5206-15T1

On appeal we employ the same summary judgment standard. Townsend v. Pierre, 221 N.J. 36, 59 (2015). We must hew to our "de novo" standard of review. Ibid.

                                III.

The February 2 letter states that defendant will be assessed the following penalties "in accordance with relevant years of service" in which he leaves the Borough's employ before completing his fifth year of service. The trial court found this provision is an unenforceable penalty provision. On appeal, the Borough argues that the provision was a liquidated damages clause and not a penalty.

Historically, New Jersey courts have distinguished between liquidated damages and penalty clauses. Wasserman's, Inc. v. Twp. of Middleton, 137 N.J. 238, 248 (1994). On the one hand, "[l]iquidated damages is the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damages that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs," and are enforceable. Ibid. (quoting Westmount Country Club v. Kameny, 82 N.J. Super. 200, 205 (1964)). On the other hand, "[a] penalty is the sum a party agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a

punishment, the threat of which is designed to prevent the breach," and is unenforceable.  Id. at 248-49 (quoting Westmount, 82 N.J. Super. at 205).

"As the law has evolved, . . . 'reasonableness' emerges as the standard for deciding the validity of stipulated damages clauses."  Id. at 249.  "Consistent with the principle of reasonableness, New Jersey courts have viewed enforceability of stipulated damages clauses as depending on whether the set amount 'is a reasonable forecast of just compensation for the harm that is caused by the breach' and whether that harm 'is incapable or very difficult of accurate estimate.'"  Id. at 250 (quoting Westmount, 82 N.J. Super. at 206).  However, this two-prong Westmount test "is best viewed not as an independent test, but rather as an element of assessing the reasonableness of a liquidated damages clause."  Ibid. (citation omitted).  "[T]he more uncertain the damages caused by a breach, the more latitude courts gave the parties on their estimate of damages."  Metlife Capital Fin. Corp. v. Wash. Ave. Assocs., 159 N.J. 484, 494 (1999).

The February 2 letter explicitly stated it is imposing "penalties" in the event defendant left his position in the first five years.  However, "the parties' characterization of stipulated damages as 'liquidated damages' or as a 'penalty' should not be dispositive."  Wasserman's, 137 N.J. at 251.  "New Jersey courts

9

have relied on the 'circumstances of the case and not on the words used by the parties' in determining the enforceability of stipulated damages clauses." Ibid. (citation omitted).

Nonetheless, the amounts assessed in the February 2 letter fail the two-prong Westmount test as well as the "'overall single test'" of whether the "'clause is reasonable under the totality of the circumstances.'" Metlife, 159 N.J. at 495 (citation omitted).

First, the amounts assessed in the February 2 letter were not "'a reasonable forecast of the provable injury resulting from breach.'" Wasserman's, 137 N.J. at 249 (citation omitted). The Borough principally contended an officer's resignation during the first five years deprives the Borough of "the experience and knowledge that the resigning officer earned while working for the Borough" and compels the Borough to "hire a brand new, inexperienced officer." The Borough's argument suggested the cost of losing the resigning officer would increase with the increase in the officer's years of experience. However, the amounts assessed in the February 2 letter decrease with the increase in the officer's years of experience at the time of resignation: $5000 in the first year; $4000 in the second year; $3000 in the third year; $2000 in the fourth year; and $1000 in the fifth year.

This strongly indicated the amounts assessed are penalties for early resignation rather than forecasts of the harm to the Borough.

Second, as the trial court found, the harm to the Borough was not "'incapable or very difficult of accurate estimate.'" Wasserman's, 137 N.J. at 250 (quoting Westmount, 82 N.J. Super. at 206). The Borough contended it paid other officers overtime to cover defendant's duties, but the costs of overtime should not be very difficult to estimate. The CBA specifies the rate of overtime at "one and one-half time [an officer's] regular straight time hourly rate of pay," which is also specified in the CBA. Similarly, the cost of hiring a new officer does not appear very difficult to estimate.

The Borough also argues that an officer's resignation results in fewer officers on the police force to perform police duties and maintain the security of the Borough. That harm might be difficult to estimate, but it was not a likely or a realized harm, as the Borough admittedly used other officers on overtime to perform defendant's duties until it hired a new officer.

In any event, "the two-pronged Westmount test" required both that the amount was a reasonable forecast of the harm "'and'" that the harm is very difficult to estimate. Metlife, 159 N.J. at 494 (citation omitted). The Borough made no attempt to show the assessments, which declined from $5000 to $1000 as the officer

11

gains experience, were a forecast of the cost of overtime to cover for him, the cost of a new hire to replace him, or the harm to the security of the Borough.[3]

Third, the $5000 the Borough attempted to assess against defendant was not "'reasonable under the totality of the circumstances.'" Id. at 495 (citation omitted). As the trial court noted, the February 2 letter's "provision would require this Officer to disgorge an amount of $5,000, dropping his first year salary to $36,000, a significant penalty to him." "[A] contractual term fixing an unreasonably large liquidated damage amount is a penalty, which is unenforceable on grounds of public policy." Rosen v. Smith Barney, Inc., 195 N.J. 423, 427 (2008).

"[T]he modern trend is towards assessing reasonableness either at the time of contract formation or at the time of the breach." Wasserman's, 137 N.J. at 251. As set forth above, there was no evidence that $5000 was a reasonable forecast of harm at the time of the February 2 letter. Moreover, the Borough presented no evidence of the actual harm it suffered when defendant resigned.

_____

[3] On appeal, the Borough concedes it "is not seeking the reimbursement of training costs" through the assessments in the February 2 letter. As the trial court noted, the Borough demanded $4151.94 reimbursement from Boonton for the "costs incurred by the former employer in the examination, hiring, and training of" defendant under N.J.S.A. 40A:14-178(a), and invoiced Boonton for the cost of his bulletproof vest. We are told Boonton paid the Borough.

The Borough argues the trial court should have heard testimony from Administrator Codey and Chief Dachisen about the costs incurred by the Borough. However, their certifications gave no indication they could testify to the costs incurred. Rather, they both certified "it is difficult to ascertain the exact monetary loss" and "it is difficult to accurately estimate the monetary harm." Appellate courts "leave to the sound discretion of the trial court the extent to which additional proof is necessary on the reasonableness of the clause." Id. at 258. We see no abuse of that discretion. The trial court reasoned: "The Borough clearly has the ability to quantify its damages. It could have presented evidence of overtime or other costs that it incurred that require the Borough to seek repayment from this Officer. It has presented nothing."

The Borough presented certifications from Administrator Codey and Chief Dachisen that "[t]he purpose of the [February 2 letter] was to encourage officers to remain on the Borough's police force" and "minimiz[e] the number of officers who leave." However, "[t]he purpose of a stipulated damages clause is not to compel the promisor to perform, but to compensate the promisee for non-performance." Wasserman's, 137 N.J. at 254.

"The decision whether a stipulated damages clause is enforceable is a question of law for the court," which we review

de novo. Id. at 257. We agree the trial court correctly concluded that the amount assessed by the February 2 letter was a penalty and unenforceable.

The Borough argues defendant had the burden of showing unreasonableness. "[L]iquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness," because "'[s]ophisticated parties acting under the advice of counsel . . . . can be better situated than courts to provide a fair and efficient remedy.'" Metlife, 159 N.J. at 496, 504 (quoting Wasserman's, 137 N.J. at 253). However, this was not a commercial contract, and nothing indicates defendant was a sophisticated party or acting with advice of counsel. Cf. D.H.M. Indus., Inc. v. Cent. Port Warehouses, Inc., 127 N.J. Super. 499, 503 (App. Div. 1973) (stressing "that this is a large commercial lease entered into by knowledgeable businessmen after arms length negotiations from positions of bargaining equality"). In any event, "[n]otwithstanding the presumptive reasonableness of stipulated damage clauses, [courts] are sensitive to the possibility that, as their history discloses, such clauses may be unconscionable and unjust." Wasserman's, 137 N.J. at 253. Defendant showed the $5000 was an unreasonable penalty.

14

The Borough argues the February 2 letter was an enforceable contract with defendant, and that the trial court disregarded genuine issues of material fact. The Borough cites the certifications of Administrator Codey and Chief Dachisen that during defendant's interview, he said he would not leave the Borough police force if a position opened up in Boonton, that the Borough relied on his answer, that he was advised of the terms in the February 2 letter, and that he voluntarily signed the letter.

However, those disputed facts are immaterial. An unreasonable penalty provision is unenforceable even if the parties voluntarily enter into it, or one party relies upon it. "Parties to a contract may not fix a penalty for its breach. The settled rule in this State is that such a contract is unlawful." Id. at 249 (quoting Westmount, 82 N.J. Super. at 205). "The law's sole purpose in departing from its usual rule of enforcing agreements, when it declines to enforce agreements for penalties, is to avoid extortion and injustice which a free power to stipulate damages would invite[.]" Westmount, 82 N.J. Super. at 206. Here, the Borough admittedly conditioned its offer of employment on defendant's execution of the February 2 letter, including a $5000 penalty, which is unenforceable regardless of the validity of the rest of the letter's terms.

"Cross motions for summary judgment do not preclude the existence of issues of fact." Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 31 (App. Div. 2012) (citing O'Keeffe v. Snyder, 83 N.J. 478, 487 (1980)). "But when there is no material issue of fact and one party is entitled to a judgment as a matter of law, summary judgment is mandated." Morton, Inc. v. Gen. Accident Ins. Co. of Am., 266 N.J. Super. 300, 323 (App. Div. 1991). Here, "in light of the record that was before the trial court and the issues presented, we find no error in summary judgment disposition." Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 177 (App. Div. 2008).

IV.

In addition to finding the assessments in the February 2 letter were unenforceable as a penalty, the trial court also found the provision was "violative [of] a collective bargaining agreement between the Police Benevolent Association, Local 92 and the Borough of Madison." Specifically, the court ruled it was "an impermissible imposition of a term or condition of employment" under N.J. Transit Auth. v. N.J. Transit PBA, 314 N.J. Super. 129 (App. Div. 1998).

In N.J. Transit, "all new applicants for employment as police officers were required to sign an agreement . . . which obligated those applicants to agree to repay Transit for portions of the

Academy training costs at issue if those Officers left the employ of Transit at any time within two years of the completion of their Academy training." Id. at 133. We rejected N.J. Transit's assertion it could impose such a requirement without negotiating with the PBA, ruling that "the terms and conditions of employment may not be established unilaterally but only by negotiations," and that the "repayment agreement is literally a term or condition of employment" which must be negotiated. Id. at 135-36. We also held that "the [Employer-Employee Relations] Act's protections would be negated by allowing employment terms and conditions to be dictated unilaterally in pre-hire agreements simply because job applicants who have been offered employment are technically not yet 'employees.'" Id. at 139.

The Borough argues there was a genuine issue of material fact about whether the assessments in the February 2 letter was negotiated and agreed to by the PBA and the SOA. The Borough cites the certifications by Administrator Codey and Chief Dachisen that "the Borough negotiated with the [PBA] and the [SOA] an incentive based probationary period of employment contract," that "both the P.B.A. and the S.O.A. agreed to the contract for five (5) new officers" including defendant, and later three other officers, and that "[t]he Borough, the P.B.A., and the S.O.A. negotiated the terms of the incentive based contract," which

17

included both the assessments and the $5000 retention stipend. The Borough also cites Dachisen's email that the presidents of the PBA and SOA were "on board" with the contracts. The Borough claims it intended to call PBA President Goncalves to testify that the PBA agreed to all the terms of the contract.

Defendant contends the PBA and SOA did not negotiate the assessments, only the stipend. He notes the absence of any mention of the assessments in the February 4 agreement, which addressed the stipend, or the February 9 resolution, which stated defendant would be compensated pursuant to the CBA. Defendant argues the February 4 agreement was not an amendment to the CBA as it was not signed by the mayor, and that his compensation was governed by the CBA. Defendant certified that Goncalves told him "such an employment condition was unenforceable and was not provided for in the [CBA] and that I could sign the [February 2 letter] without concern of the enforceability of the alleged penalty."

We need not decide whether there was a genuine issue of fact about whether the February 2 letter was negotiated between the Borough and the PBA. We also need not decide the enforceability of any other provision in the February 2 letter and the February 4 agreement. Nor need we rule on the credibility or good faith of Administrator Codey, Chief Dashisen, Goncalves, or defendant.

18

Any need to decide those issues is removed by our ruling that the $5000 assessment for defendant's resignation in his first year is an unenforceable penalty. As the Borough's complaint sought only to collect that unenforceable $5000 penalty, the complaint was properly dismissed with prejudice regardless of whether the penalty was negotiated with the PBA.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5206-15T1